HYMAN WOLFE *v.* STATE, FOR USE OF NELLIE
McCOMBS BROWN ET AL.
[No. 15, October Term, 1937.]

*Decided November 3rd, 1937.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, SHEHAN, and JOHNSON, JJ.

*John F. Mudd* and *Benjamin Michaelson,* for the appellant.

*William D. MacMillan,* with whom were *Lee I. Hecht, Harold Tschudi,* and *Albert J. Goodman,* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

James Clarence Brown died on March 7th, 1936, from injuries which he received in an automobile accident, leaving to survive him a widow, Nellie McCombs Brown, one of the equitable plaintiffs in this case. At the time of the accident he was employed as assistant manager by the Maryland Tobacco Growers Association at an annual salary of $3,000. The widow filed a claim with the Industrial Accident Commission for compensation under Code, art. 101 (as amended). The claim was allowed and compensation is paid by the Aetna Casualty & Insurance Company, the insurer.

Subsequently the widow and the insurer brought this action against Hyman Wolfe to recover damages for the death of Brown, on the theory that the accident which resulted in the injuries from which Brown died was

caused by the negligence of the defendant. The trial resulted in a verdict and judgment for the plaintiff, and from that judgment the defendant took this appeal.

The accident,. which occurred on November 13th, 1935, on Maryland Route No. 3, a state highway leading from Washington, D. C., to La Plata, Md., at a point about one-half mile south of T. B. in Prince. George's County, was a collision between an automobile operated by Hyman Wolfe, who was driving north towards Washington, and an automobile driven by Brown south towards La Plata.

The record submits fourteen exceptions, of which ten relate to rulings on evidence, one to rulings on the prayers, one to an objection to a statement made in the course of an argument by counsel for the plaintiffs, and two to the refusal of a motion for a new trial. That the purpose and relative significance of these exceptions may more readily appear, before considering them *seriatim,* a summary of the conceded facts and the contentions of the parties will be given.

The road at the point of the accident is of macadam with concrete shoulders and is about twenty-two feet wide. The accident occurred at about 11 o'clock in the morning. At that time it was raining heavily, and had been raining all the morning. Wolfe was driving a Dodge sedan, and Brown a Ford coach. The road at the point of the accident runs about north and south, and when the cars came to rest after the accident both were off the road and west of it. Near the scene of the accident and east of the road was a telephone pole, called in the testimony "Pole No. 1;" west of the road near the accident was another telephone pole called "Pole No. 2."

Hyman Wolfe at the time of the trial was seventeen years of age and must therefore at the time of the accident have been about sixteen years old. He lived on his father's farm at La Plata, and at the time of the accident was driving from La Plata to his father's home in Washington. Brown was about fifty-four years old, and at the time of the accident was traveling on the business of his employer.

The contention of the plaintiff is that, as Brown was proceeding south on the west, his right side of the road, Wolfe, proceeding north, was driving his car at a rate of speed, which, because of the wet, slippery, condition of the road, was highly dangerous, that he was driving it over a curve, and that, because of an emergency created by his own inattention, he was compelled to make a sudden swerve, that as a result of the concurrence of those factors his car skidded into the path of Brown's car and caused the accident, that the skidding was the natural and proximate result of the negligent and unskillful manner in which Wolfe operated his automobile, that the accident was therefore caused by his negligence, and that he is liable for the injuries to Brown which were caused by the collision.

The defendant's contention is that no inference of negligence can be drawn from those facts, which constitute the predicate of the plaintiff's contention, and also that there is no legally sufficient evidence to show that Brown was on his right side of the road at the time of the collision. Because of their materiality to a consideration of the defendants' demurrer prayer, the exceptions relating to rulings on evidence will be first considered.

The first person to arrive on the scene after the accident was William Voetz, who was driving north from Waldorf, which is about four miles south of T. B., where he had gone to deliver ice. Before he reached the point at which the collision occurred, a black car, which he took to be a Dodge car, passed him. He did not know then who was driving it, but later he knew that it was Wolfe. When he arrived he found Hyman Wolfe and a companion standing in the road, and discovered that Brown was seriously injured. He drove at once to the bus terminal, a short distance away, called the nearest police substation to report the accident, and then returned to the scene of the accident. He said that he was present at a conversation between Officer White and Hyman Wolfe, in the course of which Wolfe said: "That they were driving along and all of a sudden his partner

said 'Look out, you are going to hit that telephone pole' and Wolfe swerved over, and after that everything got black to him, he don't know what's going to happen"; that at that time the Wolfe car was about 100 or 150 feet from the west side of the road "into the woods," and the Brown car about 25 feet from the west side of the road in an open field.

Following the testimony of Voetz, J. A. White, a state police officer, testified that he was notified of the accident at about 11 o'clock in the morning of November 13th, 1935, that he and Corporal Rogers then went to the place where it occurred, which was about 2½ miles north of the station, that when he arrived he found the two cars on the west side of the road, the Brown car about 30 feet from the road in a field, and the Wolfe car 150 feet from the road in a little grove of trees. He saw no skid marks but did see broken glass, and he saw blue paint on a telephone pole on the left side of the road going north, which had apparently come from the Wolfe car. He then said that he asked Wolfe to give "his idea" of what happened, and that Wolfe said "he was on his way to Washington going north up the road, and rounded the curve just below the accident, I guess about one hundred feet below where the cars struck each other, travelling at a speed between forty and forty-five an hour, and as he rounded this curve he felt the car slipping toward the outer edge of the curve. A very small embankment there, not more than three feet high, slopes gradually off to the flat field, and some distance away was a telephone pole, and from the way the car was slipping toward the outside he felt that it might go headlong into the telephone pole, so he pulled sharply to the left, and to get the car back on the road to avoid hitting this pole. He felt the car turn around and he saw the other car there, and he remembered nothing from then on. I asked him if he remembered the car striking the other, and he said no, he did not know anything about it until he found his car up in the grove of balsam trees."

He then compared the paint on the telephone pole with the paint on the Wolfe car, and found that the color of the paint on the pole was the same as that of the paint on Wolfe's car. At that point a "motion" was made and denied, and that ruling is the subject of the first exception, but as the record fails to indicate the nature or purpose of the motion that ruling is not reviewable. The witness also said that the right hand side of the Wolfe car was damaged, the fenders on the right hand, and the right hand side of the body were smashed, and that the windshield was cracked but still remained in the frame. He was then asked, "Was there or not anything said by Mr. Wolfe to you, or you to him, in this conversation, about the rate of speed at which he was going at the time of the accident?" An objection to the question was overruled and the witness replied: "In endeavoring to find out something about this accident I asked Wolfe about how fast he was going and he said he had been going between forty and forty-five. I believe I said 'You ought to know better than go at that rate of speed with the road in the condition it was this kind of weather.' " A motion to strike out the answer was also overruled, and those rulings are the subject of the second and third exceptions. So much of the answer as related to the speed of the Wolfe automobile at the time of the accident was unobjectionable as an admission against interest (*Jones on Evidence*, sec. 237, *Maurice v. Worden*, 54 Md. 233; 1 *Greenleaf on Evidence* sec. 171; 22 *C. J.* 296; *Kirk & Sons v. Garrett*, 84 Md. 383, 413, 35 A. 1089), and the question which sought that information only was also proper. The answer was in part a proper reply to the question and in part a mere expression of disapproval or censure, more in the nature of an opinion than the statement of a fact, and should upon a proper motion have been stricken out. For, while it is generally held that the failure of one to deny a definite statement, made in his presence and understood by him as charging him with fault or wrongful conduct, may be construed as an admission of the truth of the state-

ment (*Jones on Evidence,* sec. 289; 22 *C. J.* 321; 1 *R. C. L.* 478; 1 *Perm. Ann. R. C. L.* 126), that rule should not be extended to include the mere opinion of a third person as to the weight and significance of facts previously admitted by the declarant. The motion was, however, properly overruled, because it went to the whole answer, a part of which was admissible, and was not directed specially to the objectionable part. *American Stores v. Herman,* 166 Md. 312, 315, 171 A. 54; *Jones on Evidence,* sec. 895.

The same witness later, without objection, gave this testimony: "Q. Can you definitely state where the spot on the road is that the contact of the two cars in effect occurred? A. Yes, I can. Q. Will you kindly do so? A. Right at that point (indicating) to the left of the center of the road. Q. Identify that more fully if you will? Will you kindly fix on here the center of the road. (Witness indicates.)"

Thereupon this testimony was given: "Therefore, as shown by the diagram, where you place the impact, the point of impact, this particular accident occurred to the left of the center of the road, or what was Mr. Brown's right hand side of the road? A. That's right, as I mentioned, it would be the left side of the road looking in a northerly direction." A motion to "strike out" was overruled, and that ruling is the subject of the seventh exception.

He was then asked: "You have fixed an X mark in the road where you fixed the point of contact of the cars; how, and by what manner do you fix that point of contact?" and answered: "A pile of glass in the middle of the road right at this point. The glass came from Brown's car and some small pieces of it from Wolfe's car." While the statement of the witness as to the point at which the collision occurred was merely an inference from commonplace facts which the jury were as well qualified to draw as he was, and not therefore the subject of opinion evidence, he had already given the same testimony without objection. There was therefore no reversi-

ble error in overruling the motion to strike out the answer to the court's question, which is the subject of the seventh exception.

Neither was there reversible error in overruling the objection to the following question, nor in overruling the motion to strike out the answer thereto, which rulings are the subject of the eighth and ninth exceptions. That question and answer merely gave the reasons for the statement, already made by the witness without objection, as to the location of the point of contact between the two cars. Since the statement itself was in without objection, it is not apparent that defendant could have been injured by a disclosure of the facts upon which it was based, especially since the witness was later permitted to and did describe the glass which he found, and indicated its precise location.

Corporal Rogers gave this testimony: "Did Mr. Wolfe make any admissions relating to the happening of this accident at that time? A. Yes. Q. Tell the court what those admissions were? A. That he, Mr. Wolfe, was *en route* from La Plata to Washington; that as he approached this turn his car had started to skid, and in pulling the car back, which would be to his left as you go north, he had lost control of the car, and Mr. Brown's car—(Objection.) He skidded directly in the path of Mr. Brown's car."

Wolfe admitted that he pulled sharply to the left and skidded directly in the path of Brown's car.

Hyman Wolfe, testifying in his own behalf, said: "I was going to Washington, North, and Mr. Brown was coming South, I was going between thirty-five and forty miles an hour; there is a slight bend in the road, not a turn; I went around the bend, had a clear vision ahead; there is a pole on my left. I saw this car on my side of the road, naturally I ducked to the right hand side to avoid hitting him, as I did. It was raining for two days, the front wheel of my car hit this dirt and I started back on the road and before I knew it he struck me, his car hit mine. Q. What part of your car did Mr. Brown's

car strike? A. The front. Q. Head on? A. No, sir, the right hand side, front right hand side, the wheel. Q. Did it make any other marks on your car? A. Just along the side."

He further testified: "That after the collision Wolfe's car went across the road about twenty-five or thirty feet, and that the Brown car went south past him between fifty and seventy-five feet. Q. When did you first notice that Mr. Brown's car was being driven over to his left hand side of the center of the road? A. Soon as I got on the turn and had clear vision enough to stop your view from looking straight, a straight stretch of the road. * * * Just what did you tell Officer White? I told him I got there and saw this man on my side of the road and I had gone off the road and my car started back on the road and skidded around and the car struck me."

When asked on cross-examination about the speed at which he was driving when the accident happened, he said, "thirty to thirty-five and slower at times." He denied telling the two officers that he was driving at forty to forty-five miles an hour, he denied telling them that when he started to pull his car over to avoid the telegraph pole everything went black before him, he said that Brown's car was "as far over to the left side of the road as it was possible to be and be on the road," that there was a slight bend in the road, and that it had been raining hard for a couple of days.

Henry William Wolfe, who was with Hyman at the time of the collision, said: "We were going to Washington, Mr. Brown coming down toward La Plata, he was on our side of the road and my cousin went off the road a little ways, thought he would straighten out and get on his side of the road * * * and his wheel got caught in the soft dirt, and as he went back on the road the opposite car struck him." He also testified that "two of his front wheels" were on the road when the Brown car struck the Wolfe car, referring to the two front wheels of the Wolfe car.

At the close of the whole case the court granted all

prayers offered by both sides except defendant's "A" or demurrer prayer, and granted this instruction of its own: "On the graph or diagram of the location of the roadway on which this accident happened, witness White indicated where he concluded the impact between the two cars occurred, namely to the west of the center of the road, based on his observation that nearly all the broken glass, or the bulk of it, was on that side. The jury are to determine just where the impact occurred from their own consideration of the facts in evidence and not from any conclusion of this or other witnesses."

No point was made in this court as to the rulings of the trial court in respect to the granted prayers, and they need not be considered. The important question in the case is raised by the refusal of defendants' demurrer prayer. Reduced to its final elements, the question which that ruling presents is whether one driving an automobile on a wet slippery curving road at forty-five miles an hour without looking to see where he is going, in such a manner that he is required to swerve suddenly to avoid striking a telephone pole on his right side, can be said as a matter of law to be exercising due care and a due regard for the safety of others, who may be using the highway lawfully and in the exercise of due care. If that can be said, defendants' demurrer prayer should have been granted. If it cannot, it was properly refused, if there is in the record evidence from which it may be inferred that Brown was at the time of the accident exercising due care and that Wolfe's negligence was the proximate cause of the accident.

An important fact to be considered in dealing with that question is whether at the time of the collision Brown's automobile was west of the center of the road.

When the officers arrived at the scene of the accident, they found broken glass from both cars in a "pretty heavy pile," with the rim of the headlight on Brown's car and some pieces of metal "of the same weight as the metal in the fender" west of the center of the road. The Brown car was about twenty-five feet from the road,

headed at an angle in a southerly direction, the Wolfe car about 150 feet west of the road, headed in a north-westerly direction. The right-hand side of the body of the Wolfe car was smashed, Brown's car was damaged on its left side.

Henry W. Wolfe testified that at the time of the collision only two wheels of Hyman's car were on the right side of the paved road, so that the two rear wheels must have been in the soft ground east of that part of the road. Hyman told Officer White that he pulled to the left to avoid striking a pole, and remembered nothing of the accident. He told Officer Rogers that he pulled to the left and skidded directly in front of the Brown car; he testified that he first pulled to the right and then to the left, and that when the cars collided Brown's car was as far to Brown's left as he could be and be on the road.

These facts are sufficient to support an inference that the collision occurred west of the center of the road. It is true that in *Shafer v. State, Use of Sundergill,* 171 Md. 506, 189 A. 273, 276, it was held that the mere fact that broken glass and blood were found near a wrecked car in a collision afforded no proof that the collision occurred near that point. But in that case, while the "greater part of the glass was near the car," there is no statement of the quantity which was found, or its character, whether it was from the car or the truck, whether it was from the windshield or the headlights. It appeared that some of it was scattered, and it does not appear that any of it was in a pile. In this case it appears that the glass formed "a pretty heavy pile," and with it were pieces of metal of the "same weight" as the metal in the fender of the Brown car. While most of the glass was from the Brown car, some of it was from Wolfe's car, and except for a "few small particles," a "few scattered pieces," no glass appears to have been found except in the pile on the west side of the road. Those facts, considered with Wolfe's admissions, the location of the cars after the collision, and the location

of the damaged parts of the respective cars, are sufficient to support an inference that the collision occurred where or near where the glass was found. It seems more probable that when pieces of metal torn from the Brown car, a rim from one of its headlights, glass from its windshield, and glass from Wolfe's car, were found grouped or piled together, that the collision occurred at or near that point, rather than at a point where there was no glass. Certainly that would be a more reasonable inference than that the collision occurred elsewhere, and that the glass was carried by the two colliding cars and dumped in one spot.

Those facts, considered with Wolfe's statement to Voetz and the officers that he swerved to the left "directly in the path of Brown's car," and the fact that Brown's car was damaged on its left side, and Wolfe's on its right side, which would be the natural result of a collision caused by Wolfe's car skidding directly in the path of the Brown car, are sufficient to permit an inference that the collision occurred on the west side of the road, *Hanna v. Royce,* 119 Or. 450, 249 P. 173, 176; *Romann v. Bender,* 190 Minn. 419, 252 N. W. 80, 34 N. C. C. A. 436, note.

Assuming that there was evidence sufficient to support a finding that at the time of the collision Brown was on the west, or, colloquially, his side of the road, the propriety of the refusal of the demurrer prayer turns upon whether negligence was inferable from the manner in which Wolfe operated his automobile.

Skidding is not in itself, and without more, evidence of negligence (5 *Amer. Jurisprudence* 654; *Fillings v. Diehlman,* 168 Md. 306, 309, 177 A. 400), nor is mere speed, certainly within lawful limits, apart from the circumstances in connection with which it is considered, ordinarily evidence of negligence. 5 *Am. Jur.* 645 *et seq.* Both take color and significance from the facts and circumstances which attend them, and either may be evidence of negligence. Skidding may be evidence of negligence if it appears that it was caused by a fail-

ure to take reasonable precaution to avoid it, when the conditions at the time made such a result probable in the absence of such precaution. Speed may be evidence of negligence where it appears that, under the circumstances, it was likely to endanger others who were in the exercise of due care. *Fillings v. Diehlman, supra;* 5 *Am. Jur.* 645, 654; *Berry on Automobiles,* secs. 247, 183, 226. The modern automobile, because of its speed, weight, power, and design, and the operation of physical laws, is peculiarly subject to the danger of uncontrollable and erratic deviations from its ordinary course. Since it is held on its course by the traction between its tires and the road surface, whatever lessens that traction makes it more difficult to control, and increases the hazard of its skidding. That tendency, because of the power, weight, and potential speed of such machines, carries a constant threat to all users of modern highways, and imposes upon the drivers of automobiles the duty of exercising at all times care and vigilance to avoid increasing the danger of skidding, created by any condition of the road surface which lessens the traction or grip of the machine on it, by adapting the management of the car to the conditions. It is a matter of common knowledge, chargeable to every one who operates an automobile on a public highway, that the danger of skidding on a wet slippery surface increases as the speed increases. And not only does the probability of skidding increase under such conditions as the speed increases, but the seriousness of the possible consequences to other users of the highway increases proportionately. It is also obvious that any sudden swerving from a straight line by an automobile driven at high speed over a wet slippery street increases the probability of skidding, and that the driver is therefore under a constant duty to use all reasonable care to discover and avoid conditions which may require such a movement. *Fillings v. Diehlman, supra; Berry on Automobiles,* sec. 247; 5 *Am. Jur.* 654.

Applying these principles to the facts of the case,

there can be no reasonable doubt that the evidence was sufficient to support a finding that the collision was caused by the defendant's negligence. In valuing the sufficiency of the evidence for that purpose, the truth of so much of it as tends to support that hypothesis, together with such inferences as may naturally and legitimately be deduced therefrom, must be assumed.

Applying that rule, it shows that at the time of the accident the defendant was driving an automobile at forty-five miles an hour in a heavy rain over a wet curving road, and that he was compelled to swerve the machine sharply to the left to avoid hitting a telephone pole, to the right of the road, which he failed to observe until his attention was directed to it by his companion, and that, as a result of the speed of the car, the condition of the road, and the sharp swerve or turn, his car skidded directly in the path of Brown's car coming from the opposite direction. Such conduct was inconsistent with the exercise of that degree of care which the law required of him under the circumstances, but on the contrary was sufficient in law to permit the inference that his negligent management of his car was the direct and proximate cause of the collision. *Fillings v. Diehlman, supra; Berry on Automobiles,* sec. 247; *Huddy on Automobiles,* sec. 373; *Rockwell v. Standard Stamping Co.,* 210 Mo. App. 168, 241 S. W. 979; *Barret v. Caddo Transfer & Warehouse Co.,* 165 La. 1075, 116 So. 563; *Arnold v. Brereton,* 261 Mass. 238, 158 N. E. 671; *Gray v. Hemenway,* 223 Mass. 293, 111 N. E. 713; *Greenbaum v. Costa,* 137 Md. 524, 528, 113 A. 79; 58 *A. L. R.* 264, note. There was therefore no error in the refusal of defendant's demurrer prayer.

The twelfth exception relates to appellant's objection to a remark made by counsel for the appellee in addressing the jury. Assuming that the statement went beyond the strict limits of proper argument, it would be difficult indeed to assume that it had the inflammatory effect on the jury which counsel for the appellant suggests. The court promptly warned the jury to disregard it, and the

remark itself was too banal and pointless to sway any jury competent or qualified to try any case however unimportant. If every irrelevant and inconsequent remark made by counsel in arguing a case to a jury were accepted as a ground for a mistrial, the hazards, delays, and expense of litigation would indeed be endless. Moreover, it is not apparent from the form of the exception just what did happen; it may be inferred that the first objection came from the court stenographer, and that defendant only objected to the statement of counsel for the plaintiff to the court. But assuming that the ruling may be reviewed, we find no abuse of the court's discretion in overruling the motion for a mistrial. The remaining exceptions were not argued and need not therefore be reviewed.

Finding no errors in the rulings of the trial court, the judgment will be affirmed.

*Judgment affirmed, with costs.*