SONNENBURG, Administratrix, Use of Herself and Insurance Company of North America *v.* MONUMENTAL MOTOR TOURS, INC.

[No. 170, October Term, 1950.]

228

*Decided June 15, 1951.*

The cause was argued before MARBURY, C. J., and COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Isidor Roman* and *Eugene A. Alexander III*, with whom was *Harry Lott* on the brief, for the appellant.

*Paul F. Due,* with whom were *Due, Nickerson & Whiteford* on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a judgment, on a directed verdict, in a suit brought by appellant's intestate against appellee and Harry M. Cromwell for damages to decedent's store and residence property, Nos. 1542 and 1540 N. Patterson Park Avenue, at the southwest corner of Federal Street, which resulted from a collision at that crossing between appellee's bus, going south on Patterson Park Avenue, and Cromwell's automobile going west on Federal Street, and the consequent propulsion of the bus across the sidewalk into and through the store and into the wall of the residence.

Patterson Park Avenue is a boulevard and has the required stop signs at Federal Street. North of Federal Street it is forty-one feet, nine inches wide from curb to curb, with sidewalks fourteen feet and thirteen feet, eight inches wide; south of Federal Street it is forty-one feet, eight inches wide, with sidewalks fourteen feet, nine inches and fourteen feet, eight inches. East of Patterson Park Avenue Federal Street is fifty-nine feet, nine inches wide, from curb to curb, with sidewalks twenty feet and twenty feet, three inches wide; west of Patterson Park Avenue it is only thirty-nine feet, five inches wide, with sidewalks thirteen feet, two inches and thirteen feet, one inch. Thus, a projection westward of the center line of Federal Street (from curb to curb) east of Patterson Park Avenue would be less than three feet north of the south curb of Federal Street west of Patterson Park Avenue. From the plat it appears that east of Patterson Park Avenue the northern building line of Federal Street is a continuation from the west in a straight line or at an imperceptible angle toward the south, though the testimony of appellee's bus driver would indicate that the line east of Patterson Park Avenue was perceptibly south of, or at a perceptible angle toward the south from, the line west of Patterson Park Avenue.

The accident occurred about 4:30 P. M. on April 12, 1949, a clear day. Appellee's bus, in which there were

no passengers, was going south on Patterson Park Avenue. Miss Augusta Ochs, then thirteen years old, who was sitting on her front steps at No. 1530, says the bus was coming "at a terrific rate of speed". Millard C. Kromm, appellee's driver, says that just before reaching Federal Street he was changing gears from second, at which the maximum speed permitted by the governor was twenty-two miles an hour, to third, thereby reducing his speed. Frederick K. Gerst, who was driving a truck with his wife and two children north on Patterson Park Avenue, says the bus was going not more than twenty miles an hour; when he was about twenty feet south of Federal Street, he saw Cromwell's automobile about twenty-five feet east of Patterson Park Avenue, going thirty-five or forty miles an hour; the bus was then about five feet north of the north building line of Federal Street; he knew Cromwell "wasn't going to stop, so I stopped", if he had not stopped Cromwell probably would have run into him and killed his wife and "kids"; Cromwell went right straight ahead and ran into the bus; they came together "sort of more on an angle", the right front of the car and the left front of the bus collided; from the time he first saw Cromwell, Cromwell went in a straight line, the bus and the car were both coming in a straight line; when the car hit the bus the bus "sort of glanced to its right;" the bus was on its right hand side of the street, whether any part of it was left of the center he does not know; the car was on its right hand side of the street. Miss Ochs, who was looking up Patterson Park Avenue, did not see the car until the collision. She says "the bus dragged the car over into the property on the corner"; the collision occurred "about the center of the intersection". Mr. Kromm, who is twenty-nine, has been driving automobiles since he was sixteen; he looked at the street intersection as he approached it, looked to his right and left and saw nothing as he started to cross; when he was back at the building line he could see about half a block to the far side of the street, on the near side he could

only see a few feet from the intersection, "you can't see around corners".; "I was on a boulevard and I had the right to assume the right of way in the first place, but I was cautious about the intersection because it is—well, I know it to be a bad one. I used to live in that neighborhood"; he saw the car as it hit him, he was then "approximately halfway across the intersection, about middleway"; the left front of the bus and the right front of the car came together. The collision "threw me from the seat and I went over toward the step well on the righthand side of the bus [formed by the steps and the closed door, where when the door is open passengers enter and leave the bus] and I managed to scramble out and turn the ignition switch off and when I tried to turn the wheels to the left to get the bus back on the street I found the wheels were locked and there was nothing I could do about it, and it happened just about as fast as I can talk about it."

Because of the different width and location of Federal Street east and west of Patterson Park Avenue the parties differently interpret the testimony that the car continued in a straight line across Patterson Park Avenue and the collision occurred in the centre of the intersection. Appellant says the collision occurred about sixty-five feet, appellee about thirty-five feet, from the store corner which the bus struck. We may assume, without deciding, that the testimony would warrant more than one inference, but it is difficult to find evidence of a distance appreciably greater than fifty feet. If the bus was going twenty miles an hour, the time between the collision of the car with the bus and the collision of the bus with the store—what appellant calls the "two accidents"—would be slightly more than one second and less than two. If the speed of the bus was greater, the time was less.

Cromwell filed a plea, but did not testify or take part in the trial, in person or by counsel. The court directed a verdict for appellee, and for appellant against Cromwell. The jury found a verdict for $8,148.75 against

Cromwell for damages to the property and contents. Neither appellant nor appellee disputes that Cromwell caused or directly contributed to the injury and damages. If negligence of appellee directly contributed to the injury and damages, then Cromwell and appellee are jointly and severally responsible to appellant. If appellee was not negligent, then Cromwell alone is responsible. Evidently Cromwell is financially irresponsible.

Appellant contends that negligence of appellee directly contributed to (1) the collision of the car and the bus, which appellant calls the "first accident" and (2) the collision of the bus with the store, which appellant calls the "second accident". As to the "first accident" appellant contends that: Negligence is relative, a breach of duty owed by one to another. The boulevard law primarily governs the relative rights and duties of favored and unfavored drivers. The duty to keep a bus off the sidewalk and out of a store and dwelling is a higher duty than that owed to an unfavored driver who by his violation of the boulevard law causes a collision. A bus is heavier, and in that respect more dangerous, than an ordinary automobile. Negligence of other drivers is one of the known dangers of driving. The driver knew this was a bad crossing. If he had looked, he could have seen, as Mr. Gerst saw, that Cromwell was not going to stop and could have avoided the accident. Instead, he went ahead "at a terrific speed" without looking, or without looking when he could have seen.

These contentions are now open only to the extent, if any, to which they have not been foreclosed by the decisions of this court. The boulevard law (now Art. 66½, secs. 178, 187) originated in Chapter 224 of the Acts of 1929. Decisions of this court construing the statute become part of the statute and continue to be so unless and until changed by statute. *Greenfeld v. Hook*, 177 Md. 116, 8 A. 2d 888, 136 A. L. R. 1485, was decided almost twelve years ago. It was a suit by an unfavored driver against the favored driver. Notwithstanding the plaintiff's contributory negligence this court

found sufficient evidence to go to the jury on the last clear chance theory. The court, saying it was considering "the relative rights of travelers" on a boulevard and an intersecting highway (*Shedlock v. Marshall*, 186 Md. 218, 232, 46 A. 2d 349) stated the near-absolute right of way of the favored driver, his right to assume that the unfavored driver will both stop and yield the right of way and to "exercise the privilege of uninterrupted travel" without stopping or slowing down to bring his car into control. *Greenfeld v. Hook* has repeatedly been quoted in later cases. Little has been added to what was then said regarding "the relative rights of travelers", but much has been done in expanding the scope and application of what was then said to persons in other relations. In *Clautice v. Murphy*, 180 Md. 558, 563, 26 A. 2d 406, 408, the court said, "The driver of the taxicab was, of course, under the duty to recognize that drivers from the left will often cross negligently, miscalculating the chances of collision. *United Railways & Electric Co. v. State*, 163 Md. 313, 325, 163 A. 90; *United Railways & Electric Co. v. Crain*, 123 Md. 332, 91 A. 405; *Lange v. Affleck*, 160 Md. 695, 155 A. 150, 79 A. L. R. 1274; *Pennsylvania Steel Co. v. Wilkinson*, 107 Md. 574, 581, 69 A. 412, 16 L. R. A. (N. S.) 200; 72 *Univ of Pa. Law Review*, 211, 343; *Torts, Restatement*, Sec. 449; *Warner v. Markoe, supra.*" *Clautice v. Murphy* was not a boulevard case. The driver of a taxicab or any other driver is not under a duty to anticipate, in the absence of evidence, that other drivers will often—or ever—cross negligently in violation of the boulevard law. The favored driver on a boulevard is not his brother's keeper. In *Belle Isle Cab Co. v. Pruitt*, 187 Md. 174, 179-181, 49 A. 2d 537, 539, a suit by a passenger against a taxicab company, the court, after quoting at length from *Greenfeld v. Hook*, said, "In the Greenfeld case, however, the court found evidence to permit the case to go to the jury on the theory of last clear chance. And in other passages in that opinion the court recognized that the driver on the favored

highway does not have an absolute right to proceed under all circumstances. See also the comment on this case in 4 Md. L. R. 207, 213. The recitals in Section 1 of Article 66½ of the Code, as codified, would seem to negative any implication that the statute was designed to change the established law of negligence so as to relieve the favored driver of all duty to use care. But in determining due care, the assumption that the unfavored driver will stop and yield the right of way is an important factor." *Greenfeld v. Hook* is the last case in which this court has found circumstances under which the favored driver had not the right to proceed or had failed in any duty to use care. Meanwhile the "relative rights of travelers" have become the measure of the relative rights of favored drivers and victims of unfavored drivers, including passengers of the favored drivers (*Belle Isle Cab Co. v. Pruitt, supra; Baltimore Transit Co. v. O'Donovan*, 197 Md. 274, 78 A. 2d 647) and strangers not guilty of contributory negligence or chargeable with the unfavored drivers' negligence. *Brooks v. Childress*, 198 Md. 1, 81 A. 2d 47. The statement in *Greenfeld v. Hook*, following in this respect *Blinder v. Monaghan*, 171 Md. 77, 188 A. 31, that "the obvious and essential purpose" of the statute "is to accelerate the flow of traffic on through highways" was quote in *Belle Isle Cab Co. v. Pruitt* [187 Md. 174, 49 A. 537]. In the latest case in this court this was said to be "the primary purpose of the statute". *Brooks v. Childress, supra.*

We see no basis for holding that appellee owed any higher degree of care to appellant than it owed to its own passengers. Indeed, if boulevard traffic were a menace to abutting property, this would be a factor to be considered by the authorities in determining whether to designate a boulevard in a congested part of a city. If a traveler owed a greater duty to persons and owners of property in the vicinity of a boulevard than to fellow travelers on the boulevard, he could not discharge his greater duty and also exercise "the privilege of uninterrupted travel" or carry out "the primary purpose of

the statute". It cannot be disputed that when a bus leaves the highway, crosses a sidewalk and crashes through a store and into an adjoining residence the happening of the accident justifies an inference or "presumption" of negligence—of some one. In the instant case the court properly directed a verdict against Cromwell. But the legislature has not declared an automobile a deodand or made it or its owner responsible for death or damage without fault. Damage done by financially irresponsible drivers and owners of automobiles is always a hardship to the victim.

Nor does the bus driver's testimony that he "knew [the intersection] to be a bad one" establish a duty to anticipate violation of the boulevard law. In *Belle Isle Cab Co. v. Pruitt* "the Police Department had erected a sign upon the favored highway reading, 'Slow, Dangerous Corner'." The court said, "We do not mean to imply any lack of authority to erect warning or cautionary signs in the interest of safety, * * * but we think such signs cannot have the effect of limiting the privilege of uninterrupted travel on a favored highway which the statute confers." 187 Md. 181. The court also expressed doubt as to what "dangerous" meant; in the instant case the driver's testimony is no more clear in this respect. It cannot be inferred or assumed that violation of the boulevard law was the danger he had in mind. Moreover, in *Baltimore Transit Co. v. O'Donovan, supra,* a passenger testified that she moved from a window after she saw the danger of a collision. The court said, "If her reaction was quicker [than the bus driver's] it may have been due to nervous apprehension." 197 Md. 278. From the driver's testimony that he looked to the left when he was at the building line but could only see a few feet on the near side of Federal Street, because "you can't see around corners", it is evident that, if he looked, he looked before the bus, or his seat in the bus, reached the building line. But "the privilege of uninterrupted travel which the statute confers" exempts him from any duty "to slow down and bring his car

into control". If he had looked later than he says he looked, without slowing down and bringing the bus into control, there is no evidence that he could have avoided the accident. If the jury chose to disbelieve his testimony, it could not supply by speculation the absence of any evidence at all.

Appellant stresses the "terrific rate of speed" of the bus. There is no evidence either (1) that the speed of the bus was excessive or (2) that it had any causal relation to the damage to appellant's property. If we assume, without deciding, that testimony that the bus was running "at a terrific rate of speed" was admissible in evidence (*People's Drug Stores v. Windham*, 178 Md. 172, 180, 12 A. 2d 532), it was not legally sufficient to show that the speed was excessive and unlawful. *Cf. Kaufman v. Baltimore Transit Co.*, 197 Md. 141, 146-147, 78 A. 2d 464, 467. The only speed that caused damage was speed of the Cromwell car. When a bus moving south is struck by a car moving west the bus will naturally be thrown both west and south of the place of collision. If the bus is struck at all, it will be thrown from its course. If it is moving at all, it will continue in its course as changed by the blow. Only if the bus is standing still will it be thrown in the same direction as the course of the car.

The fact that the bus was heavier than an ordinary automobile and the extent of the damage to the store and contents and the house are not evidence of negligence on the part of the bus owner. In affirming a judgment on a verdict directed for a defendant, the owner of a truck which "weighed more than thirteen tons", the favored vehicle on a boulevard, the court said, "No evidence was introduced to show the type of brakes on the truck, * * * the condition of the treads on the tires of the truck, or the reaction time of the driver. * * * Of course, when a heavily loaded tractor-trailer strikes an automobile, the impact naturally causes much destruction. Negligence cannot be proven from testimony as to what happened after the accident. There is no evidence as to

what occurred in the tractor after the collision. The truck driver may have been thrown from his position back of the wheel, with no control of the operation of the truck. The effect of the impact might have been to accelerate its speed by jamming the accelerator to the floor of the vehicle. As Childress points out, it is not difficult to understand how several steel guard posts 125 feet away from the collision could have been destroyed by the tractor-trailer weighing over thirteen tons and heavily loaded, which was not being steered or controlled in any manner by its driver." *Brooks v. Childress, supra.*

Appellant earnestly argues that appellee caused the second accident by failing to apply the emergency brake during the interval—between one and two seconds, or less—between the first and second accidents. Appellant invokes the doctrine of negligence in emergencies and cites cases holding that (1) whether an emergency existed and (2) whether the person involved was negligent in the emergency are ordinarily questions for the jury. *Newman v. Stocker,* 161 Md. 552, 554-555, 157 A. 761; *Consolidated Gas, Electric Light & Power Co. v. O'Neill,* 175 Md. 47, 51-52, 200 A. 359. In invoking this doctrine appellant confuses it and in effect sets up a straw man to knock down. The doctrine of negligence in emergencies is not a ground of liability for negligence but an excuse for apparent negligence. A jury cannot find negligence, without evidence, in an emergency or in any other situation. One who is apparently guilty of negligence excuses his apparent negligence by asserting that he acted in an emergency and that what in other circumstances would have been negligence is not negligence in view of the emergency. To be hurled across a sidewalk and through a store by an automobile violating the boulevard law is not actual or apparent negligence. Appellee does not excuse apparent negligence, but denies the fact or the appearance of negligence on its part. There is no evidence on what side of the bus the emergency brake was, or whether the driver, thrown from his

seat toward the "step well", could have reached the emergency brake before the "second accident", or that the brake would have been as effective as the steering wheel if the wheels had not been locked. In *United Railways and Electric Co. v. Mantik*, 127 Md. 197, 203-204, 96 A. 261, 264, the court said, "By its sixteenth prayer the defendant asked a direction that a verdict be rendered in its favor if the jury found that the collision was caused by the failure of the chauffeur to apply his emergency brake when he first saw the cars approaching. The testimony of the chauffeur was emphatic and undenied to the contrary, and his instant and diligent effort to escape the danger indicates that he was anxious to employ the most practicable means to that end. Under such circumstances, and upon the evidence before us, it could not fairly be held that the chauffeur's decision, in the stress of the emergency by which he was suddenly confronted, to use the steering wheel instead of the brake to accomplish the object for which he was striving, should be treated as a controlling factor in the determination of the question as to the right of recovery."

The passage quoted above from *Brooks v. Childress* is also controlling as to appellant's attempt to segregate the "second accident" and hold appellee liable. "Negligence cannot be proven from testimony as to what happened after the accident." As we have said, if the jury chose to disbelieve the driver's testimony then there would be no evidence at all as to what he did after the collision.

*Judgment affirmed with costs.*