## DARIENZO TRUCKING CORPORATION ET AL. *v.* SULLIVAN ET AL.
### (Two Appeals in One Record)
[No. 97, October Term, 1952.]

*Decided March 13, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Jesse Slingluff, Jr.,* with whom were *John G. Rouse, Jr.,* and *Piper & Marbury* on the brief, for the appellants.

*John J. Shea* for the appellees.

HAMMOND, J., delivered the opinion of the Court.

The appellants seek reversal of judgments on verdicts by a jury finding the driver of the tractor-trailer belonging to the Darienzo Trucking Corporation guilty of negligence, directly contributing to an accident which damaged the appellees. The Trial Court rejected motions for directed verdicts at the conclusion of the plaintiffs' case, and at the conclusion of the whole case, and also refused to grant motions for judgments notwithstanding the verdicts.

It is necessary, therefore, to consider the evidence, and in so doing to resolve all conflicts in favor of the plaintiffs below, the appellees here, and to assume the truth of all evidence and all inferences properly to be deduced from such evidence which may support plaintiffs' claims.

The accident occurred in October about 6:00 P.M. on the southbound by-pass on U. S. Route 1, in Laurel, Maryland. There are four lanes and on each side is a gravel shoulder twenty-four to thirty inches wide. At the beginning of the by-pass, there is a sign showing the speed limit to be thirty-five miles per hour. There is another such sign approximately one-tenth of a mile beyond the first. At the west side of the road about two-tenths of a mile south of the second of these signs is a Blue Sunoco filling station. North, towards Baltimore from this station, is a restaurant known as the Flamingo, and beyond that is an Esso filling station, which is about one thousand feet on the Baltimore side of the Sunoco station. One of the plaintiffs, Theron Wolfe, had driven his car, in which were four passengers,

into the Sunoco station for gasoline, had been served, and had pulled away from the tanks, but was still some thirteen feet off the boulevard, waiting to proceed south, when the accident reached its crescendo. Benjamin Archer, one of the passengers, said that while Wolfe was waiting for the traffic to clear so that he could get back on the highway, the tractor-trailer, owned by one appellant and operated by the other, ran through the filling station out of control and hit the Wolfe car as it sat in the driveway of the filling station. The witness said that as he was watching, he saw "the trailer make a swerve and to the outer edge of the road, and swerve back towards the tractor and the next come through the filling station." The tractor-trailer was three hundred feet away when he first saw it; he knows this because he measured it with a steel tape. The witness drives thirty thousand miles a year and has been driving since 1914; he estimates that the truck was travelling in the neighborhood of fifty miles an hour when he first saw it. The tractor-trailer knocked down the steel sign post of the filling station which supported a neon sign and broke the air pump. The Wolfe car was damaged severely. The trailer turned over on it and the tractor demolished the rear. The trunk part was completely demolished. Also damaged in the accident was a Nash automobile parked at the filling station.

The trailer was smashed beyond repair. Archer said he heard the truck driver's explanation of the accident to the State Trooper to this effect: "a station wagon cut in on him, passed by him, and cut short in front of him, is why he swerved the first time, or why he lost control of the truck." Archer did not see any vehicle cut off the tractor-trailer.

Another witness for the plaintiffs, Leicester Cabey, was in the Esso station getting gas for a truck he was driving. It was parked on the outside pump near the right hand lane. He observed a tractor-trailer pass him, his attention was called to it by its speed and he spoke of it to by-standars. He estimated the speed at some

forty or forty-five miles an hour. He said that the truck driver, when he talked to him about half an hour after the accident, said that a taxi-cab had pulled in and cut him off.

Another passenger in the automobile, Thomas Dailey, says that the speed of the tractor-trailer was approximately fifty miles an hour just before it hit the steel pole supporting the neon sign at the filling station.

The filling station attendant, testifying for the defendants, said that he heard a very loud and very shrill blast from an airhorn, and described this as a horn carried on most large vehicles such as tractor-trailers. He looked around to see what had happened because of the noise of the horn, and as he looked, the tractor-trailer and this other vehicle were some three hundred feet away from him. He saw the tractor-trailer in the extreme right hand lane and he also saw what was either a station wagon or a town and country sedan in the next lane. He was looking into two sets of headlights. He then testified: "As I said before when I looked around at this horn blowing, then I heard these brakes along about the time I heard the airhorn . . .; I looked and it looked like these two sets of headlights were merging together. . . I heard a rendering crash; it sounded like metal scraping to me; it wasn't too shrill or loud; it didn't last too long; the tractor-trailer come on out into the gravel driveway there and got to swinging back and forth like this;". At this point the witness ran for safety, and then heard the crash as the trailer hit the post which was holding the neon sign and did the damage which has been described. This witness estimates the speed of the tractor-trailer at thirty to thirty-five miles an hour. On cross-examination, he said that he first heard the airhorn and then he heard the brakes, and he also stated that if the vehicles did lock, they pulled apart immediately.

The driver of the tractor-trailer said that he was coming from New York to the Quantico Marine School in Virginia, driving a White tractor with a Fruehoff trailer loaded with potatoes, and the gross weight of the tractor-

trailer and the potatoes was about thirty-nine thousand pounds. His description of the accident was: ". . . as I was coming down the No. 1 highway, a fellow in a station wagon, it was a car in other words, pulled over on me; I blowed my horn and he seemed to move; it seemed to me he was going to cut into the filling station or off the road; I blew my horn at him; just then he got over to the front of my truck, his back end touched the front of my truck which automatically fused the wheels and run me over in the gravel; once I got over in the gravel, quite naturally as anyone knows if you run over in the gravel shoulder, it will automatically throw your truck; well I kind of got my truck straight; I had my brakes on; I pushed on the accelerator, trying to get enough speed to pull it back straight; the proper way to get a tractor straight is to start jacking on it so I had it almost straight; I couldn't get it back on the highway; I hit the island; that automatically tore my trailer in half; then the tractor run up in to Mr. Wolfe's car." He says he was driving around thirty to thirty-five miles an hour. In response to a question as to whether the station wagon had actually passed him, he said: "Well, he got up beside me, when I blew my horn it looked like he turned back over, like he was going off the road in the station." He was asked when he applied his brakes. His answer was: "As soon as the other vehicle come in contact with me, I did apply my brakes."

A taxi-cab driver testified that he was driving back to Laurel from the direction of Baltimore and he overtook the tractor-trailer in the extreme right lane and the station wagon in the lane next to it on the left. He was approaching to pass over in the third lane, going between thirty-five and forty miles an hour. As he got near the two vehicles, he heard a horn blow and then he saw the tractor go over into the dirt. The station wagon stopped soon thereafter and the driver was standing beside it. The taxi driver pulled up behind him. Then suddenly, the driver of the station wagon jumped in his automobile, slammed his door and sped off.

The taxi-driver did not take the license number of the station wagon, explaining that "I didn't know the man had been in it or I could very easily have gotten the man's number." When he was asked whether he saw the station wagon pull around in front of the tractor-trailer, his reply was: "From where I was it looked like he wasn't actually pulling around it; it looked like to me he was trying to crowd him, more like this." He heard the horn blow but he did not hear the brakes applied.

The appellants base their contention that the Court should have directed a verdict on the ground that there was no evidence to show that the driver of the truck was guilty of any negligence directly contributing to the injuries complained of. They say that the plaintiff must meet the burden of proving negligence on the part of the defendant, and in addition, must prove that such negligence was the proximate cause of the damage claimed. They argue that there is no evidence sufficient to show that the tractor-trailer was going at an excessive rate of speed, and that even if the jury properly could find excessive speed, the speed did not directly cause or contribute to the accident. They say that the sole cause of the accident was the station wagon which cut in front of the tractor-trailer, throwing it out of control. This, they contend, makes the sole proximate cause of the injuries of the plaintiffs the negligence of the driver of the station wagon. The appellants rely on cases such as *Sun Cab Co. v. Faulkner*, 163 Md. 477, 163 A. 194, and *Sonnenburg v. Monumental Motor Tours*, 198 Md. 227, 81 A. 2d 617. In the *Sun Cab* case, the taxi-cab in which the plaintiff was riding approached a street intersection, favored by a green light, at a speed in excess of that permitted by law. Another taxi-cab, carrying an injured man hurriedly to a hospital at the directon of a police officer, ran through the red light. The two drivers came within sight of each other at a distance of thirty feet apart, and both swerved. The testimony was that they came together immediately

after they came within sight of each other. The Court considered, as a settled fact, that the driver claimed to be going at an excessive speed was entitled to go forward on the assumption that no one would attempt to drive across his right of way given him by the green light. The Court found that if there was negligence in the rate of speed at which the cab was being driven, that negligence was not the cause of the collision. It found further that there was no foundation in fact to show that if the cab had been driven at a reduced speed, its driver might have avoided the collision after the two cabs came within sight of each other. The Court said further, that the contribution of the speeding cab was only that of being there at the moment, "a circumstance which might have arisen with or without negligence in approaching the place." [163 Md. 477, 163 A. 195]

In the *Sonnenburg* case, a bus proceeding south on a boulevard, was struck by a car coming west on a side street. As a result, the bus ran across the sidewalk, through a store, and into the wall of a residence. The car had violated the right-of-way of the bus by entering the boulevard. The claim was that the excessive speed of the bus was evidence of negligence. The Court found that there was no evidence that the speed of the bus was excessive or that, if it was, "it had any causal relation to the damage to appellant's property." [198 Md. 237, 81 A. 2d 621]

This Court has often recognized that speed in excess of that permitted by law is not always or necessarily evidence of negligence which gives rise to liability. See *Gudelsky v. Boone*, 180 Md. 265-70, 23 A. 2d 694, where this rule is stated and a number of cases cited in support.

On the other hand, it has often been held that speed may be evidence of negligence. In *Wolfe v. State, for use of Brown*, 173 Md. 103, 117, 194 A. 832, it is pointed out that speed takes color and significance from the facts and circumstances in which it is found. In *Bozman v. State, to Use of Cronbrandt*, 177 Md. 151, 9 A. 2d 60, the Court held that "Excessive speed, which may con-

stitute negligence if it contributes to an accident, may be inferred from such testimony as that the brakes were put on too late, or that the car did not stop until it had gone an extraordinary distance after the brakes were applied. The jury is not compelled to believe that the witnesses for either side are accurate in their testimony regarding the speed or the manner of operation of a motor vehicle." In *Powers v. State,* 178 Md. 23-28, 11 A. 2d 909, there was testimony as to excessive speed and the Court held that the testimony as to speed, the impact against the guard rail, and other facts, justified the trial court in submitting the case to the jury. The cases hold that in order to justify a directed verdict, the evidence should admit of no inference of negligence in the operation of the automobile.

We think there is in this case evidence from which the jury could find that the tractor-trailer, weighing with its load almost twenty tons, was being driven at a speed beyond that permitted by law and at a speed fraught with foreseeable potential and dangerous consequences in the environment in which it was indulged. We think that it cannot be said, as a matter of law, that this negligent operation did not directly contribute to the damage to the vehicles parked in the filling station and their occupants. It must be noted that the *Sun Cab* Case and the *Sonnenburg* case both involved accidents in which a favored vehicle not reasonably to be charged with anticipation of what ensued, was struck by an unlawful interloper and that the accidents happened with such speed and suddenness that the opportunity for avoidance on the part of the favored car was absent to a point which made the negligence of the interloper the sole proximate cause of the collisions.

In this case the evidence did not require the Court or the jury to find that there was any such sudden intervening cause, independent of the operation of the tractor-trailer, which alone could account for the happening of the accident. This is not a right of way or intersection case. There was an appreciable length of time while

both vehicles were running along the road before either the impact between the two or the crowding of the truck by the station wagon, whichever occurred. This is clear from the evidence of several witnesses for the appellees and from the testimony of the driver of the truck himself. From the evidence the jury could reasonably find that the tractor-trailer was speeding in an area where the presence of filling stations, restaurants, stores and other abutting activities which require reduced speed limits in built up neighborhoods adjoining a busy highway would cause traffic anticipating lawful and proper speed thereon frequently to leave or enter the boulevard, and could further find that when the station wagon came abreast of the larger vehicle and gave signs that it was about to turn into the right hand lane, the driver of the tractor-trailer had an opportunity and an obligation to apply his brakes in place of blowing his airhorn. There was testimony that he blew the horn before he applied the brakes. Indeed, he himself admitted that he did not apply his brakes until the back end of the station wagon touched his truck. The jury could likewise determine that if he had been proceeding at a reasonable rate of speed and had applied his brakes when he observed that the station wagon might obstruct his lane, or come unduly close, the impact would not have taken place and the tractor-trailer would not have gone out of control. The jury, not unreasonably, could have decided that if the speed of the tractor-trailer had been reasonable, the fact that the driver pulled over, or that the truck swerved over on the gravel shoulder, would not have produced the uncontrollable effect on the vehicle which did occur at the high rate of speed at which it was travelling. So also the jury could have found that if the rate of speed had been reasonable and all the events occurred which the driver of the truck testified did occur, yet the large vehicle could have been brought under control within the three hundred feet it travelled between the meeting with the station wagon and the damage to the filling station. The jury was not required

to believe the explanation of the driver of the tractor-trailer that it was necessary to, and that he did, accelerate the vehicle in an effort to pull it straight after he had applied his brakes. They may have believed from the evidence that his operation of the heavy vehicle, during the emergency in which he found himself, was negligent rather than skillful, or in the words of Judge Bond, speaking for the Court in *Newman v. Stocker*, 161 Md. 552, 157 A. 761, in describing a similar situation, the jury "might still, we think, conclude that the subsequent acceleration of the speed of the car, to which the defendant testified, was a mistake which a driver exercising due care would not have made, and was the cause of the collision with the pole." See also *Consol. Gas Co. v. O'Neill*, 175 Md. 47, 200 A. 359.

In *Ness v. Males*, 201 Md. 235, 93 A. 2d 541, a car entered the boulevard and turned left, and was then struck by a tractor-trailer proceeding towards the car. Judge Henderson, speaking for the Court said that the jury might have found that the accident resulted from "the swinging across the center line of the unloaded trailer, bouncing on the rough downhill surface when the air brakes were applied to a vehicle moving at a high rate of speed". The owners of the tractor-trailer contended that as far as causation is concerned, it was immaterial where the accident occurred if the braking action that made the trailer swing was made necessary by the sudden intrusion of the unfavored vehicle. The Court said that the jury might well find that the truck driver was at fault, not for relying upon his right-of-way, but "for driving at a high speed over a hill around a curve where he knew the visibility was limited, past a filling station where parked vehicles were to be expected and the room for passage might be narrowed." The Court then said, in considering whether this was negligence, "the jury could consider all the surrounding circumstances, including the propensity of unloaded trailers to swing when operated downhill on a rough surface. If the situation presented could properly be described

as an emergency, it was largely of his own creation and at least presented a question for the jury".

We think that the similarity between that case and the facts and the underlying probable cause of the accident in this case is convincing. Here the driver of the tractor-trailer, the jury might well find, could reasonably have foreseen that in a built up neighborhood there was real probability of sudden intrusions on the highway, or the crossing from one lane of traffic to another, which would necessitate a sudden stop of a heavily loaded trailer, and that if he operated at excessive speed this might cause a swerving, making it difficult, if not impossible, to control the vehicle. We think the Trial Court was correct in permitting the jury to pass on the questions of negligence.

*Judgments affirmed, with costs.*