## EASTERN CONTRACTORS, INC. ET AL. *v.* STATE, USE OF SEIFERT ET AL.

(Two Appeals in One Record)

[No. 6, September Term, 1960.]

114

*Decided March 8, 1961.*

*Dissenting opinion filed March 29, 1961.*

*Motion for rehearing, for modification of judgment and of opinion filed by the equitable plaintiffs March 16, 1961, rehearing denied and opinion modified April 7, 1961.*

The cause was argued on September 14, 1960, before
BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and
HORNEY, JJ., and reargued on January 17, 1961, before
BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT,
HORNEY, MARBURY and SYBERT, JJ.

*William J. McWilliams* on both arguments for the appellants.

*Hyman A. Pressman* on both arguments, with whom was
*Noah A. Hillman* on the brief, for the equitable plaintiffs,
part of the appellees.

*John H. Mudd* on both arguments, with whom were *W.
Harvey Beardmore, Semmes, Bowen & Semmes* and *Rouse
& Morton* on the brief, for Buckley & Company, Inc., the
other appellee.

HENDERSON, J., delivered the opinion of the Court.

August R. Seifert, employed as a special police officer by
Buckley & Co., Inc., a dirt moving contractor working on the
approaches to the Baltimore Harbor Tunnel, was killed while
directing traffic on the morning of June 1, 1956, at the intersection of Belle Grove Road, a paved State highway running east and west, and a temporary dirt road intersecting it
at right angles. His widow and children brought a death case
action against Eastern Contractors, Inc., and its employee
Jeffers and against Buckley and its employee Rhodes. Eastern
brought an action against Buckley for damages to its truck.
The cases were consolidated for trial. It was shown that Aetna
Casualty and Insurance Company, appearing as plaintiff-subrogee in the death case, had paid $10,000 to the widow and
children of Seifert under a Workmen's Compensation policy
it had written for Buckley. At the conclusion of the trial the

jury answered issues submitted, determining that Jeffers was guilty of negligence directly contributing to the happening of the accident, that Rhodes was likewise guilty, and that Seifert was not guilty. The court entered judgments for the Seiferts in the amounts found by the jury, less a remittitur of $10,000 which was accepted, against Eastern, Jeffers and Rhodes; granted a motion for judgment N.O.V. in favor of Buckley, the conforming employer; and entered a judgment for costs in favor of Buckley against Eastern in the property damage case. Eastern and Jeffers appealed.

The appellants make three contentions: (1) that the trial court erred in its instructions to the jury as to the negligence of Jeffers and Rhodes, (2) that the court erred in refusing to grant a motion for mistrial at the conclusion of the closing argument of counsel for the Seiferts, and (3) that the court unduly restricted the cross-examination of Rhodes by counsel for the appellants. To resolve the first contention it is necessary to review the testimony in some detail.

Belle Grove Road is a heavily travelled highway twenty-five feet wide with nine-foot dirt shoulders. The temporary dirt road was forty-eight feet wide. Traffic at the intersection was controlled by an overhead signal light, installed by Buckley under a permit issued by the State Roads Commission, and by traffic officers, of whom Seifert was one. It was shown that the traffic light had an automatic cycle 50 sec. green for Belle Grove Road, then 5 sec. amber, then 25 sec. red. For the intersecting road the interval was 25 sec. green, 5 sec. amber, 50 sec. red. When the light turned red for either road, it turned green for the other road. Buckley was engaged in moving dirt across the State highway and had been so engaged for two or three months before the accident. The traffic light had been installed for a month to six weeks. During the same period Eastern had been engaged in hauling sand along the Belle Grove Road. On the morning of the accident Jeffers was driving east on Belle Grove Road up grade in a ten-wheel Mack truck loaded with sand, and Rhodes was driving north on the dirt road down grade in a payscraper thirty feet long loaded with about eighteen cubic yards of dirt and

weighing about thirty-five tons. It was powered by a diesel engine and had air brakes on all wheels. The vehicles collided in the intersection, and it would appear from photographs and other evidence that the left front of the payscraper struck the truck on its right side behind the front wheel, blowing the front tire and rupturing the air line to the brakes. The impact caused the truck to move sideways and diagonally across the road where it came to rest on its side in the ditch on the north side of Belle Grove Road. The damage to the truck was over $6,000. In its progress it struck and killed Mr. Seifert, who had started to run but ran in the wrong direction toward the east. The payscraper came to rest about eight feet from the south side of the paved portion of Belle Grove Road at an angle toward the south.

Jeffers testified that he was thoroughly familiar with the road and crossing in the course of making some 20 round trips daily. He knew that the payscrapers, of which there were eight on the job, were using the crossing. He testified that he stopped because the light was red. Traffic moving west on Belle Grove Road also stopped for the light. When the light changed to green he started across in low split second gear at a speed of from two to three miles per hour. The officer also waved him to come on. Jeffers testified he had frequently seen the payscrapers go across the road when he was stopped for a red light. It was shown that he had testified at a magistrate's hearing in 1956 that he had seen them "go across the road when I saw the light changing." He explained that he meant "they might go across sometimes" when "right at the road," not against a red light. He didn't see the payscraper until just before the impact. He looked to his right when he saw the officer start to run. He heard the noise of the payscraper coming over the hill but didn't look at it. He couldn't judge its speed without knowing what gear it was in. The motors make more noise in the lower gears.

Clinton Smith, seventy-two years of age, testified he was driving his car west on Belle Grove Road and stopped for the red light at the edge of the intersection. He saw the Eastern truck loaded with sand stop on the opposite side.

There were several cars behind the truck and a tank truck and several cars behind his own car. He saw the officer directing traffic standing about in the center of the dirt road and on the north side of Belle Grove Road on the shoulder. When the light changed to green, the officer blew his whistle and made an arm signal, and he started up. The tank truck was blowing for him to go ahead. His wife yelled "look at that thing coming down hill, that's going to hit something." He stopped about eight feet into the forty-eight foot crossing zone. He saw the payscraper strike the truck, which was crossing at a slow rate of speed, on its right side. Mr. Seifert ran towards his car, but the truck hit him. Mrs. Smith testified to the same effect. She saw the light turn green, and heard the officer blow his whistle. Her husband started but stopped when she noticed the big payscraper coming down and cried out.

Rhodes testified that he was driving the loaded payscraper at about ten to twelve miles per hour in second gear as he approached the crossing. The vehicle was equipped with air brakes and could also be stopped "instantly" by tripping a lever and dropping the pan. He testified that the light was green for him when he was thirty feet from the intersection, and Mr. Seifert gave him a signal to come on. He saw the sand truck, but it did not stop at the intersection but came straight through. At the last moment he realized that the truck "wasn't observing the light at all." He turned to his right, but the truck struck his hub cap and "drug up the side". He was "jack-knifed" and at a "dead stop" when the truck hit him. After the accident Rhodes told an investigating officer he didn't remember anything at all that had happened.

The case presents a sharp conflict of evidence as to which vehicle had the right of way. If the testimony of Jeffers and the Smiths is to be believed by the triers of fact, Jeffers had the green light and was directed to proceed by the officer in charge. He moved more than twenty-four feet to the point of impact at a speed of three miles per hour. It may be inferred that during that interval the payscraper, moving at

twelve miles per hour, would cover four times the distance, or ninety-six feet, with the red light against him all the way. Allowing for reaction time and time to start the truck from a standstill, the payscraper may have been much farther away. On the other hand, if Rhodes is believed, he had the green light in his favor, and Jeffers came through without stopping against the red and struck the payscaper while it was at a standstill. But instead of instructing the jury that the case turned on who had the right of way, the trial court gave the following instruction:

> "The Court further instructs you, at the request of Buckley & Company, that an operator of a vehicle, even though given the green or go signal at an intersection, is required to use due care and caution to see that traffic in the intersection is such that he can proceed with safety and he must regard and heed traffic conditions, even though he has the green light. Therefore, even if you find it a fact that the Eastern Contractors' vehicle had the green light, and you also find that the operator thereof, Preston Jeffers, failed to observe the conditions of the traffic about him, and did not pay proper attention to approaching or crossing vehicles, or in any other respect failed to use due care, then your verdict must be against Eastern Contractors and Preston Jeffers, because you would have determined that he was negligent in the operation of his truck."

It is perfectly clear, as the first sentence of the instruction states, that a driver having a green light in his favor cannot ignore traffic in the intersection when the light changes. The amber interval affords vehicles facing it an opportunity to stop and requires that they stop, "but if such stop cannot be made in safety a vehicle may be driven cautiously through the intersection." Code (1957), Art. 66½, sec. 193 (b) (1). It also allows time for vehicles entering on a green or amber light to complete the crossing, but does not authorize entry against a red light. If the amber interval is insufficient in the

case of wide streets or long or ponderous vehicles, the mere fact that the light may have turned green in favor of traffic moving along the intersecting street does not alter the right to complete the passage. Code (1957), Art. 66½, sec. 193 (a) states the rule clearly: "Green alone or 'go.' (1) Vehicles facing the signal may proceed straight through or turn right or left unless a sign at such place prohibits either such turn. All vehicles shall yield the right of way to other vehicles and to pedestrians lawfully within the intersection at the time such signal is exhibited." Subsection (c) "Red alone or 'stop'" provides: "(1) Vehicles facing the signal shall stop before entering the nearest cross-walk at an intersection or at such other point as may be indicated by a clearly visible line and shall remain standing until green or 'go' is shown alone." The subsection first quoted was applied in *Valench v. Belle Isle Cab Co.,* 196 Md. 118, and *Eisenhower v. Balto. Transit Co.,* 190 Md. 528, 534. Cf. *Caryl v. Baltimore Transit Co.,* 190 Md. 162, and *United States Fid. & Guar. Co. v. Continental Baking Co.,* 172 Md. 24.

But the second part of the instruction does not follow from the first. The jury was instructed that if the favored driver failed to observe the conditions of the traffic about him and did not pay proper attention to approaching vehicles, or in any other respect failed to use due care, the verdict must be against him. We may note that the instruction is incomplete in that it leaves out any reference to proximate cause. In effect, the court was directing a verdict against the favored driver, for Jeffers admitted that he did not see the payscraper "approaching" the intersection, although it may be inferred that it was at a substantial distance at the time he started across. This goes far beyond the statutory duty to yield the right of way to vehicles "lawfully" in the intersection and imports that he was not entitled to rely upon his right of way even as to vehicles unlawfully entering the intersection against a red light. We think that is not a correct statement of the law. We think the applicable rule of law is well settled under the Maryland cases.

In *Sun Cab Co., Inc. v. Cialkowski,* 217 Md. 253, 257,

a case in which, in one view of the evidence, a pedestrian had a green light and was struck by a cab coming through against the red, Chief Judge Brune, for the Court, said that "the jury could properly have found that the plaintiff had the right of way and that he was not bound to anticipate that the driver of the taxicab would not respect it", citing the *Caryl* case, *supra,* and *Wintrobe v. Hart,* 178 Md. 289. In the *Wintrobe* case, it was said at p. 298, citing a number of earlier cases, that "a plaintiff was not guilty of contributory negligence in failing to look up and down the street after she had rightfully undertaken to cross, since she had the right to assume that her right of way would be respected." It was held that a prayer (p. 295) to the effect that the verdict must be for the defendant if the plaintiff "could have seen the defendant's automobile approaching * * * in time to have stopped * * * and that she failed to do so, thereby contributing to the happening of the accident", imposed too strict a duty upon appellant and should not have been granted.

In a long line of cases it has been held that there is no duty to anticipate that a driver facing a stop sign or red light will not obey the statutory obligation to stop and yield the right of way. See, for example, *Carlin v. Worthington,* 172 Md. 505, 509, where the rule was analogized to the "stop, look, and listen" rule applicable to railroads, *Belle Isle Cab Co. v. Pruitt,* 187 Md. 174, *Sonnenburg v. Monumental Motor Tours,* 198 Md. 227, and *Shriner v. Mullhausen,* 210 Md. 104. In *Katzel v. Clark,* 215 Md. 54, 62, the so-called "boulevard" rule was stated, quoting from *Schwartz v. Price,* 215 Md. 43, 48, and citing a number of cases. See also *White v. Yellow Cab Company,* 216 Md. 286, 289. In *State v. Marvil Package Co.,* 202 Md. 592, it was held that the proximate cause of the accident was the failure of the unfavored driver to stop in obedience to a flashing red signal under sec. 196 (1), and not the failure of the favored driver to see the unfavored vehicle until just prior to the impact. In the leading case of *Sun Cab Co. v. Faulkner,* 163 Md. 477, 479, it was held that the proximate cause of the collision was the failure of a cab to respect a red light, and not the excessive

speed of the other vehicle. See also *Gudelsky v. Boone,* 180 Md. 265, a traffic light case.

Cases dealing with the right of way at intersections not controlled by traffic lights or stop signs are clearly distinguishable, and have been distinguished. *Houlihan v. McCall,* 197 Md. 130, 137; *Legum v. Hough,* 192 Md. 1; *Wlodkowski v. Yerkaitis,* 190 Md. 128; *Nardone v. Underwood,* 219 Md. 326. In the *Legum* case, *supra,* we said (p. 4) that the statutory right of way rule (Code (1957), Art. 66½, sec. 231) was applicable only "where traffic is not controlled by traffic lights or stop signs". On p. 6 it was said: "The limited effect thus given to the right of way rule has not escaped criticism. * * * Nevertheless, although a more stringent rule, comparable to the 'stop, look and listen' rule, has been applied in cases where traffic is controlled by lights (*Sun Cab v. Faulkner,* 163 Md. 477, 163 A. 194; *Gudelsky v. Boone,* 180 Md. 265, 23 A. 2d 694) or by stop signs (*Carlin v. Worthington,* 172 Md. 505, 192 A. 356; *Shedlock v. Marshall,* 186 Md. 218, 46 A. 2d 349; *Belle Isle Cab Co. v. Pruitt,* 187 Md. 174, 49 A. 2d 537), the rule announced in the *Ottenritter* case [151 Md. 525] is still the law of Maryland, in the case of uncontrolled crossings." In the instant case the crossing was not uncontrolled, but was controlled by both stop lights and a traffic officer.

We think the boulevard cases are in point because they deal with signs or signals imposing a peremptory duty to stop similar to that imposed by the subsection involved in the instant case, "Red alone or 'stop.'" The red light is simply another form of stop signal, as was clearly stated in the *Legum* case. The point is further illustrated by *Hickory Transfer Co. v. Nezbed,* 202 Md. 253. There a traffic light on a boulevard was out of order, although the light facing the intersecting street was functioning. The driver on the boulevard assumed that the traffic light had been switched off and that the boulevard stop signs controlled. The driver on the intersecting street came through on a green light, believing that the red light was against the other vehicle. It was held that each driver was entitled to rely on his right

of way and that neither was negligent. There was no suggestion that the vehicle facing the green light had a higher duty of care.

Moreover, the same rule has been applied in cases, above cited, involving pedestrians, who are included with vehicles in the very subsection in question. There may be circumstances apart from nice calculations of time and distance, under which a favored driver proceeding on a green light may be put upon notice that an unfavored driver will enter unlawfully. But we think the evidence in the instant case does not present such a case, assuming that the testimony of Jeffers is believed. Failure to see the unfavored vehicle was not the proximate cause of the accident because if he had seen it, he could properly have assumed that it would stop. *Schwartz v. Price, supra,* and cases there cited. If the vehicle was more than ninety-six feet away and moving at only twelve miles per hour, with the unusual capacity of stopping not only by the use of air brakes, but by dropping the "pan", there was no reason to suppose that it would not stop in obedience to the signal. The fact that it was making considerable noise in second gear would not give notice that it would ignore the red light. Jeffers's pretrial statement that he had seen other payscrapers crossing when the lights were changing would not alter the case. He did not say that he ever saw a vehicle enter the intersection against a red light; in fact he testified just to the contrary. Since we think his pretrial statement was not inconsistent with his testimony when called as an adverse party, we do not reach the question whether the prior statement could be used as affirmative evidence, and not merely to affect his credibility. See *Sun Cab Co., Inc. v. Cusick,* 209 Md. 354, 361. It was upon the latter theory that the trial court admitted it.

The appellees rely strongly upon the cases of *Sklar v. Southcomb,* 194 Md. 626, and *Baltimore Transit Co. v. Young,* 189 Md. 428. In the *Sklar* case, the favored driver did not see a car which was being driven through a red light at the end of a funeral procession. At that time the statute (Code (1957), Art. 66½, sec. 193 (f), states the present law on

the subject) did not give the right of way to a funeral procession, but there was proof of a long established custom, whereby vehicles, following the first vehicle in a funeral procession that entered on a green light, continued to cross despite a change of lights, and that Southcomb had knowledge of it. Other waiting cars in two lanes were allowing Sklar to pass when Southcomb attempted to pass them on the wrong side of the street. It was held that a jury question was presented as to whether Sklar's negligence in passing on the wrong side contributed to the accident. The case is readily distinguishable. The *Young* case, dealing with an emergency vehicle accorded a statutory right of way, is not in point.

It is not without significance in the instant case that according to Jeffers and the Smiths the traffic officer, Mr. Seifert, did not anticipate that the payscraper would run the red light, for he gave the signal for east and west traffic to proceed after the light turned green. It is difficult to see why Jeffers should be charged with negligence if he depended upon the judgment of the traffic officer or, conversely, how Jeffers could have been guilty of negligence and the officer not equally guilty. Under sec. 181 of the Motor Vehicle Law it was Jeffers's duty to obey the direction of the traffic officer. Neither the officer, Jeffers, nor the Smiths anticipated that the payscraper would run the light until it was actually at or in the intersection. Obviously, it was then too late for Jeffers to stop. We find no evidence of negligence on the part of Jeffers except upon the theory that he entered upon a red light as Rhodes maintained. On the other hand, if Rhodes's testimony is believed, the sole and proximate cause of the accident was that Jeffers failed to stop at a red light. We think that issue, and that alone, should have been put to the jury as regards the negligence *vel non* of Jeffers and Rhodes.

Since the case must be retried, we shall briefly discuss the other points raised. Counsel for the Seiferts in his closing argument to the jury said: "If your answer to issue No. 1 is 'no', then the plaintiff will walk out of this court without a cent." There was a motion for mistrial, which the court denied. Nor did the court give any curative instruction. We

think the argument was improper, although it is argued that counsel for the appellants opened the subject by telling the jury that if their answer was "no", Eastern would recover for damages to its truck. The contention is made that counsel for the appellants is estopped to raise the point since he invited the retaliation or reply. However that may be, we think the statement carried an implication that Rhodes was impecunious or not covered by insurance, which may or may not have been the case. The cases generally recognize that references to wealth or poverty in a civil case are improper. See Note, 32 A.L.R. 2d 9. Rhodes has not appealed, and the question suggested by the appellees that he may not have been liable as a fellow servant of Seifert is not before us. The statement was particularly harmful in view of the erroneous instruction as to liability. We may assume that it will not be repeated upon the new trial.

The final question is whether counsel for the appellants was unduly restricted in his cross-examination of Rhodes. Jeffers and Rhodes were each called by the plaintiffs as adverse parties. The only questions put to Rhodes were to elicit his claim that he had the green light as he entered the intersection. The trial court sought to limit cross-examination by counsel for the appellants to the issue developed in direct examination, but suggested that counsel might call Rhodes as an adverse party. This counsel did, apparently acquiescing in the court's ruling. In any event, we think the record does not show an abuse of the court's discretion, or that the appellants were prejudiced thereby.

The appellants do not challenge the correctness of the court's ruling as to the judgment N.O.V. in the death case. It was shown, of course, that Buckley was a conforming employer. See *Baltimore Transit Co. v. State,* 183 Md. 674; *Congressional Country Club v. Baltimore & O. R. Co.,* 194 Md. 533.

Upon remand, there is no occasion to resubmit to a jury the issue as to damages. Maryland Rule 872 a; *Keitz v. National Paving Co.,* 214 Md. 479, 504. Nor do we see any occasion to resubmit the issue as to the contributory negligence

of Seifert, which was not mentioned in the appellants' brief. There was no appeal from the judgment against Rhodes. Thus, the only issue to be resubmitted is as to the negligence *vel non* of Jeffers and Eastern.

> *Judgments against Eastern and Jeffers reversed; judgment in favor of Buckley in the death case affirmed; judgment in favor of Buckley in the property damage case reversed; costs to be paid by the appellees; case remanded for a new trial.*

BRUNE, C. J., filed the following dissenting opinion, in which HAMMOND and HORNEY, JJ., concurred.

The Legislature has recognized at least these three different types of highway intersections, with different statutory provisions applicable to each: (1) uncontrolled intersections; (2) intersections controlled by traffic lights; and (3) intersections controlled by fixed stop signs erected by the State Roads Commission or other authorized public authority.[1] The majority opinion consolidates the last two by making the so called boulevard rule applicable to changing light intersections.

At an uncontrolled intersection, the driver approaching to the right of the other driver has the right of way over the latter. Code (1957), Art. 66½, § 231.[2] This section is a cautionary guide, rather than a peremptory command. *Wlodkowski v. Yerkaitis,* 190 Md. 128, 57 A. 2d 792; *Legum v. Hough,*

---

1. Not all intersections fall within one of these three classifications, and in some situations other special rules are applicable. Such rules will be referred to herein where it seems appropriate.

2. For simplicity and consistency all references in this opinion to statutory provisions will, unless otherwise stated, be to Art. 66½ of the 1957 Edition of the Code, and will be only to section numbers. The accident here involved was in 1956, but there were no intervening changes in the laws pertinent to this case.

192 Md. 1, 63 A. 2d 316; *Rabinovitz v. Kilner,* 206 Md. 455, 112 A. 2d 483. The bright hope that this statute, which was first adopted in 1916, would solve the prior confusion in intersection collision cases simply and definitely (see *Buckey v. White,* 137 Md. 124, 111 A. 777) was not realized. See, for example, in addition to the cases above cited, *Chiswell v. Nichols,* 137 Md. 291, 112 A. 363; *Taxicab Co. v. Ottenritter,* 151 Md. 525, 135 A. 587; *Askin v. Long,* 176 Md. 545, 6 A. 2d 246.

Intersections controlled by traffic signals are generally governed by § 193.[3] Section 193 reads in part as follows:

> "Whenever traffic is controlled by traffic-control signals exhibiting the words 'go,' 'caution,' or 'stop,' or exhibiting different colored lights successively one at a time the following colors only shall be used and said terms and lights shall indicate as follows:
>
> "(a) *Green alone or 'go.'*
>
> (1) Vehicles facing the signal may proceed straight through or turn right or left unless a sign at such place prohibits either such turn. All vehicles shall yield the right of way to other vehicles and to pedestrians lawfully within the intersection at the time such signal is exhibited.
>
> \* \* \* \* \* \* \*
>
> "(b) *Amber alone or 'caution' when shown following the green or 'go' signal.*
>
> (1) Vehicles facing the signal shall stop before entering the nearest crosswalk at the intersection, *but if such stop cannot be made in safety a vehicle may be driven cautiously through the intersection.* [Italics in this sentence supplied.]
>
> \* \* \* \* \* \* \*
>
> "(c) *Red alone or 'stop.'*
>
> (1) Vehicles facing the signal shall stop before

---

**3.** There are other provisions as to the right of way of pedestrians generally in § 236, as to the right of way of blind pedestrians in § 194.

entering the nearest crosswalk at an intersection or at such other point as may be indicated by a clearly visible line and shall remain standing until green or 'go' is shown alone.

* * * * * * *"

Sections 189-191 provide for the installation by the State Roads Commission or by local authorities of traffic control devices, of which "stop" signs are a very common form. Section 192 prohibits disobedience to traffic control devices "unless at the time otherwise directed by a peace officer." Section 2 (60) defines a "Through Highway" as "Every highway or portion thereof at the entrances to which vehicular traffic from intersecting highways is required to stop and yield right of way before entering or crossing the same and when stop signs are erected as provided in this article." Section 242 authorizes the State Roads Commission with reference to State and County highways, and local authorities with reference to other highways, to designate through highways and to erect stop signs at entrances thereto. Section 242 (c) requires drivers to come to a full stop at such signs (or stop lines) before entering the intersection and to "yield the right of way to vehicles approaching on the intersecting highway *except when directed to proceed by a peace officer or traffic-control signal.*" (Italics supplied.) There may be some overlapping between § 242 and §§ 189-192 and also between § 242 and § 233, but there seems to be no inconsistency.

Section 233 (a) reads as follows:

"(a) *In general.*—The driver of a vehicle shall come to a full stop as required by this article at the entrance to a through highway and shall yield the right of way to other vehicles approaching on said through highway."

Section 233 (b) contains a similar provision where a stop sign is erected at an entrance to an intersecting highway which is not a part of a through highway.

The "boulevard rule" has evolved from cases where collisions occurred between motor vehicles on through highways

and those entering from other roads. It would be a tedious and rather useless undertaking to review them all, but it does seem important to state the foundation of the rule which runs through many of the cases. This is the purpose to accelerate the flow of traffic over through highways. It was first stated by Judge Offutt in *Blinder v. Monaghan,* 171 Md. 77, 83-84, 188 A. 31, when he said: "The manifest purpose of the statute is to facilitate and expedite the movement of traffic within and between congested centers of population by setting aside selected highways as through roads, over which traffic may move without interruption or delay. To accomplish that, it dispenses with the right of way rules applicable to highways generally, and gives the right of way to all traffic on such highways, and, as a necessary police measure for the protection of the traveling public, it provides that no one shall enter such a highway without first stopping, and that, having stopped, the operator of any vehicle approaching such a highway shall yield the right of way to 'all vehicles approaching' thereon." Other cases so stating the purpose of the statute include *Greenfeld v. Hook,* 177 Md. 116, 8 A. 2d 888; *Madge v. Fabrizio,* 179 Md. 517, 20 A. 2d 172; *Brooks v. Childress,* 198 Md. 1, 81 A. 2d 47; *Baltimore Transit Co. v. O'Donovan,* 197 Md. 274, 78 A. 2d 647; *Sonnenburg v. Monumental Motor Tours, Inc.,* 198 Md. 227, 81 A. 2d 617; *Sun Cab Co. v. Cusick,* 209 Md. 354, 121 A. 2d 188.

The language of § 233 (b) relating to stopping and yielding the right of way before entering a street or road protected by a stop sign is substantially identical with that of § 233 (a), and § 242 applies to both. Because of these facts the boulevard rule was held applicable to a vehicle entering a favored highway protected by a stop sign, even though the favored highway was not a "through highway" in *Belle Isle Cab Co. v. Pruitt,* 187 Md. 174, 49 A. 2d 537, a 4-2 decision in which Judge Henderson wrote the majority opinion and Judge Markell wrote a vigorous dissent based upon the facts that the favored highway was not a through road and that the favored driver ignored a caution sign. Judge Delaplaine joined in the dissent. The language of § 234 with regard to

vehicles entering a "paved public highway" from an unpaved public highway or from a private road is also almost identical with that of § 233 (a) as to stopping and yielding the right of way. Because of that fact, and even in the absence of a stop sign, this Court held the same rule applicable as in "boulevard stop" cases, this time over the vigorous dissent of Judge Hammond, in *Shriner v. Mullhausen,* 210 Md. 104, 122 A. 2d 570 and 821.

It has been stated in several cases that the boulevard rule is a statutory application of the old "stop, look and listen" rule with respect to railway crossings. This seems to have been first said in *Carlin v. Worthington,* 172 Md. 505, at 509, 192 A. 356. Statements to like effect may also be found in: *Greenfeld v. Hook, supra,* in which (177 Md. at 130) Judge Offutt referred to that rule as "the severest rule known to the common law of America;" *Pegelow v. Johnson,* 177 Md. 345, 9 A. 2d 645; *Legum v. Hough, supra;* and in the majority opinion in the instant case.

The foundation of the "stop, look and listen" rule is, I think, contributory negligence. This seems clear from *Philadelphia, W. & B. R. Co. v. Hogeland,* 66 Md. 149, 7 A. 105, which was the one case cited in *Carlin v. Worthington, supra,* for an exposition of the rule which was stated at 66 Md. 161, 7 A. 107 (though the rule was there found inapplicable because the negligence of the driver was held not imputable to the plaintiff, who had been a passenger in the vehicle that was struck). Among other cases also showing that the rule is one of contributory negligence, see *Pennsylvania R. R. Co. v. Yingling,* 148 Md. 169, 179, 129 A. 36; *Baltimore & O. R. R. Co. v. Bruchy,* 161 Md. 175, 155 A. 346; *Baltimore & O. R. R. Co. v. State, Use of Andrews,* 190 Md. 227, 58 A. 2d 243; and *Sears v. Baltimore & O. R. R. Co.,* 219 Md. 118, 148 A. 2d 366.

More or less correlative to this fundamental aspect of the "stop, look and listen" rule is the rule dealing with the question of the primary negligence of the railroad, under which it may be assumed that the person who should stop, look and listen, or yield the right of way, or both, will do so. In many

instances this seems to be an application of the rule that one who is in a place of safety will not normally be expected to leave it to enter a place of known danger unless he has satisfied himself that he can do so safely. This correlative rule applies, or can apply, in many different situations, including all kinds of intersection cases, whether railroad grade crossings or highway intersections controlled by stop signs or traffic lights, or wholly uncontrolled by traffic devices, and cases involving safety islands on which pedestrians may await a favorable opportunity to cross busy streets.

At this point it seems appropriate to observe that, in general, railroad crossing cases in which the railroad has been held not to be guilty of primary negligence have been cases in which the railroad has given adequate warning by whistle, bell, lights, or other means, of the approach of a train; and it has been held in such cases to be entitled to rely on the assumption that the injured party would heed the warning. See, for example, *Western Maryland R. Co. v. Myers,* 163 Md. 534, 163 A. 700; *Pennsylvania R. R. Co. v. State, Use of Brewer,* 188 Md. 646, 53 A. 2d 562; *Baltimore & O. R. R. Co. v. Leasure,* 193 Md. 523, 69 A. 2d 248. See also, *State, Use of Emerson v. Baltimore & O. R. R. Co.,* 171 Md. 584, 190 A. 231, where the fact that the railroad had given warning was pointed out, even though there was no statutory obligation to do so. Even though it gives warning, a railroad still has an obligation to avoid injuring others, if it learns of their danger in time to do so.

There is no general statutory requirement for the driver of a vehicle on a favored highway to give notice of his approach to an intersection; yet in the boulevard cases the presumption that the unfavored driver will stop and yield the right of way is applied most rigorously and is given the broadest scope. As Judge Markell pointed out in *Sonnenburg v. Monumental Motor Tours, Inc., supra* (198 Md. at 235), the "relative rights of travelers" have become the measure of the relative rights of favored drivers and unfavored drivers and victims of unfavored drivers, including passengers of the favored drivers and strangers not guilty of contributory negligence

or chargeable with the unfavored driver's negligence. Judge Markell seems to have accepted the sweeping application of the boulevard cases somewhat wistfully; but he accepted the boulevard rule as a firmly established construction by this Court of the statutory provisions relating to through highways or other streets protected by similar signs (as in *Belle Isle Cab Co. v. Pruitt, supra*); and I also, of course, accept it as settled law.

But when we come to the heart of this traffic light case, I find no adequate reason for extending the boulevard rule to cover it.

*First.* There is no through traffic to be expedited, for from the nature of the alternating colors of the traffic control light, there can be no such thing. Thus the primary basis for the boulevard rule simply does not exist. Without it any analogy to the railroad crossing cases based upon the expedition of uninterrupted through traffic necessarily falls.

*Second.* Any analogy to what I have called a rule correlative to the "stop, look and listen" rule—the presumption that one who should stop, look and listen will do so—is, in my opinion, so seriously impaired (even if not completely destroyed) as to be inapplicable because of the obvious and inherent difference between a changing traffic light which sometimes says "stop" and sometimes says "go" and a fixed unchanging stop sign which always says "stop and yield the right of way." This point is closely related to the matter of proximate causation which is discussed below.

*Third.* The statutes involved recognize the difference between fixed and changing signs, and § 193 clearly makes allowance for it. Two great purposes of traffic regulation are to promote safety and to expedite the movement of traffic. It seems to me evident that safety is promoted by the exercise of caution by travelers on both highways at intersections where at one moment the north-south highway is the favored highway and a few seconds later the east-west highway supplants it as such. It is also, I think, evident that so long as one highway or the other has the green light, traffic on that highway is intended to have the benefit of such expe-

dition as a traffic light may reasonably afford. The pinch comes at the time of transition—when the green light becomes red and vice versa. Here the Legislature has provided for the amber signal, which is essentially cautionary. (§ 193 (b).) At just what moment the obligation to stop which it imposes becomes operative is left somewhat flexible. A driver approaching a light as amber follows green is given the option if he cannot stop safely before entering the intersection, to continue through it "cautiously." He must make his decision almost instantaneously, and it is not always an easy decision to make. He must also determine, if he thinks he cannot stop safely before entering the intersection, what is a cautious way to proceed through it, and this, too, may not be an easy decision. One driver might reach one conclusion as to whether to stop or to go ahead (and if to go ahead, how to do so), and another the opposite conclusion in the brief moment when he has to make up his mind. Uncertainties of these kinds seem unavoidable when a traffic light changes. The Legislature has made allowance for these uncertainties at the time of transition from one signal to another.

Legislative intention to deal with the two situations differently and legislative understanding that they are different also seem to me to be demonstrated by the provisions of § 242 (c) and the similar provisions of § 192, both mentioned above, to the effect that a driver about to enter a through highway shall come to a full stop and yield the right of way except when directed to proceed by a traffic control signal. Where there is such a signal this Court has held that the boulevard law does not apply. *Gudelsky v. Boone,* 180 Md. 265, 268, 23 A. 2d 694. Curiously enough, through reliance on a *dictum* referring to *Gudelsky,* the majority seeks to derive support from *Gudelsky* for its holding in this case.

The majority opinion seems to me to brush aside the distinctions which the statutes recognize between boulevard and traffic light intersections. That, I think, is not correct as a matter of statutory construction.

*Fourth.* The main question here is one of negligence or contributory negligence on the part of Eastern and its truck

driver. For present purposes, it may be assumed that the Buckley payscraper was not lawfully in the intersection when Eastern's driver got the green light, and a hand signal from Seifert, the crossing watchman who was killed. If it had been, it would, of course, have had the right of way to complete the passage. § 193 (a) (1); *Valench v. Belle Isle Cab Co.,* 196 Md. 118, 75 A. 2d 97.[4]

The majority opinion confines *Valench* strictly to its facts and deals with the question almost exclusively as one of right of way to be solved by determining who had the green light at a particular instant of time. Yet the majority seems to accept the view that what is foreseeable is an important element in determining proximate causation. *Sun Cab Co. v. Faulkner,* 163 Md. 477, 163 A. 194, cited by the majority as a principal authority, so recognized when the Court said (163 Md. at 480): "It is generally held that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances."

The negligence question here is simply, what would a reasonable, prudent man do under the circumstances confronting Jeffers, the driver of the Eastern truck? The majority opinion, (for all practical purposes accepting Jeffers' testimony as true, though theoretically not doing so, and making "nice calculations" based thereon which the boulevard rule purports to spurn and to make unnecessary) holds that he need neither see nor hear the Buckley vehicle, that he may ignore its existence and that he may drive straight ahead as soon as he gets the green light. It is beyond my comprehension

---

4. See also *United States Fidelity & Guaranty Co. v. Continental Baking Co.,* 172 Md. 24, 190 A. 768; *Wintrobe v. Hart,* 178 Md. 289, 13 A. 2d 365; *Caryl v. Baltimore Transit Co.,* 190 Md. 162, 58 A. 2d 239; *Sun Cab Co. v. Cialkowski,* 217 Md. 253, 142 A. 2d 587; three dealing with the rights of pedestrians who started across with a green light.

how a reasonable, prudent man could fail to see or hear a huge, roaring piece of earth moving equipment approaching the intersection that he is about to enter, or how, if he did see or hear it, "he could" sensibly (the majority says "properly") "have assumed that it would stop." Driving into the path of an onrushing heavy vehicle would seem to me to present a collision as a foreseeable consequence, and the likelihood of injury to a third person, such as Mr. Seifert, standing in the intersection, would seem too obvious for comment.

The boulevard cases in this Court in which injury or damage has been regarded as foreseeable are, indeed, few and far between. See *Greenfeld v. Hook, supra* (1939), and *Sun Cab Co. v. Hall,* 199 Md. 461, 86 A. 2d 914 (1952). Yet even the boulevard cases habitually recognize that there may be such cases. So does the majority opinion in the instant case; but I should regard it as a most difficult undertaking to state what case would meet the test, if this one does not. *Sklar v. Southcomb,* 194 Md. 626, 72 A. 2d 11, which is a traffic light case, held that it was a jury question whether the driver of a car getting the green light was guilty of negligence where he knew of but ignored a local custom (not then sanctioned by law) by which cars in a funeral procession followed across an intersection, notwithstanding a change of light from green to red, and the driver who had just gotten the green light ran into the last car in the funeral procession in the intersection. I should doubt that the known custom involved in the *Sklar* case presented a more foreseeable danger of collision than did the approach of the Buckley payscraper here.

Even cases applying the boulevard rule do not purport to make the presumption that the unfavored driver will stop and yield the right of way a conclusive presumption. *Belle Isle Cab Co. v. Pruitt, supra,* 187 Md. at 179-180.

*Fifth.* In my estimation, the majority view does not have any substantial support in the prior decisions of this Court. *Valench* is rigorously confined by the majority to the narrow limits of the intersection; and as to anything outside those limits the driver of a car just getting the green light is told that he may wear blinders and ear muffs and go right ahead.

*Sklar v. Southcomb, supra,* is dismissed with little, if any attempt, to show why the custom there involved would be any more in the mind of a reasonable, prudent driver getting the green light than would be the loud noise and obvious visibility of the approaching payscraper in this case.

Having disposed of *Valench* and *Sklar,* the opinion of the Court finds authority for its conclusion in *Legum v. Hough, supra.* The heart of that case as authority for the decision in this, is found in a passage quoted by the majority in this case, where the Court, speaking through Judge Henderson, after referring to the rather limited effect given to the car-on-the-right rule as to the right of way (§ 231) said (192 Md. at p. 6): "The limited effect thus given to the right of way rule has not escaped criticism. * * * Nevertheless, although a more stringent rule, comparable to the 'stop, look and listen' rule, has been applied in cases where traffic is controlled by lights (*Sun Cab Co. v. Faulkner,* 163 Md. 477, 163 A. 194; *Gudelsky v. Boone,* 180 Md. 265, 23 A. 2d 694) or by stop signs (*Carlin v. Worthington,* 172 Md. 505, 192 A. 356; *Shedlock v. Marshall,* 186 Md. 218, 46 A. 2d 349; *Belle Isle Cab Co. v. Pruitt,* 187 Md. 174, 49 A. 2d 537), the rule announced in the *Ottenritter* case [151 Md. 525] is still the law of Maryland * * *."

*Legum v. Hough* from which the above quotation is taken was itself an uncontrolled intersection collision case. I fully agree with the majority that such cases "are clearly distinguishable and have been distinguished." It seems clear to me that the discussion of traffic light and stop signs cases in the above passage was not in any way necessary to the decision of *Legum,* and is to be regarded as *obiter dictum.* Insofar as the traffic light cases—*Sun Cab v. Faulkner* and *Gudelsky v. Boone*—are concerned, it lacks the merit of complete accuracy. One may say, if he chooses, that the results in those cases were similar to those in railroad crossing cases where the "stop, look and listen" rule was applied; but such was not the ground of decision in either of those cases. On the contrary, one will search those cases in vain for any reference to that rule. *Sun Cab v. Faulkner* was decided before

*Carlin v. Worthington, supra,* had even suggested the analogy; *Gudelsky* was decided on the explicit holding (among others) that the boulevard law did not apply, since the intersection where the collision occurred was controlled by a traffic light, and there was no reference whatsoever, through the boulevard cases or otherwise, to the "stop, look and listen" rule. The majority's chief authority for its holding thus seems to me to be only a *dictum* embodying something less than a complete and accurate analysis of the two traffic light cases therein referred to.

*Sun Cab v. Faulkner* relied upon in *Blinder v. Monaghan, supra,* and in other boulevard cases in support of a finding that the driver on the favored highway was not guilty of any negligence constituting the (or a) proximate cause of the accident, was a traffic light case. Questions of proximate causation are to be found in both traffic light controlled intersections and boulevard intersection cases, (*Katzel v. Clark,* 215 Md. 54, 137 A. 2d 125), as well as in other kinds of tort cases involving negligence. I think it a fair generalization to say that where *Sun Cab v. Faulkner* and like cases have been cited in boulevard cases, they have been relied upon on an *a fortiori* basis—that if this is the rule in traffic light cases, it must even more be the rule in boulevard cases. Thus in *Blinder v. Monaghan, supra* (171 Md. at 84), the Court said: "Where, as in this case, the operator of a vehicle enters such a highway [a through highway] in disregard of these explicit and mandatory rules, and collides with another vehicle approaching thereon, the collision can only be attributed to his negligence, for in such a case the principle announced in *Sun Cab Co. v. Faulkner,* 163 Md. 477, 163 A. 194, applies with peculiar force." Because of the difference between the two kinds of intersection control, that seems to me a sound approach, but it does not support opposite reasoning. I know of no case prior to this in which the boulevard cases have been held controlling as to traffic light intersection cases.

Not only is the opinion of the Court on this principal question unsupported by any prior direct authority in this State,

but it is, so far as I am informed, contrary to the holdings of courts of other States on substantially the same question. Because of the already great length of this dissent and because the case must be determined as a matter of Maryland law, I shall not undertake to review the authorities elsewhere. I shall only refer to a well known text book as to the rule at such intersections as we are dealing with here. Blashfield, *Cyclopedia of Insurance Law*, Sec. 1028, states the general rule that "[m]otorists driving along streets protected at intersections by traffic lights or stop and go signals are justified in assuming that a driver approaching such an intersection understands the signals and will not undertake to cross against them, and need not anticipate that a driver will enter the intersection in violation of a stop signal," but goes on to say: "Though it is not negligence for the favored driver to act on assumptions of this nature until he has or reasonably should have knowledge to the contrary, he is bound, after acquiring such knowledge, to exercise the care of an ordinarily prudent person."

Also because of the length of this opinion, I shall say no more of the extent to which, in my estimation, the majority has gone in evaluating the evidence, despite this being a jury case.

In summary, it is my view that the holding of the majority is an extension of the boulevard rule to a situation in which neither the basic reason for the boulevard rule nor any analogy to the "stop, look and listen" rule supports the extension of the boulevard rule and where its extension simply overrides statutory differences between traffic light and stop intersections which the Legislature has established. In addition, it subjects innocent bystanders to risks of personal injury or death and of property damage, without redress from one of the parties whose actions contribute to their loss, where ordinary attention by a driver to his surroundings would enable him to avoid a collision and consequent injury, death or loss. Admiral Farragut's famous order at the Battle of Mobile Bay seems to me out of place at a traffic light, even at a green one.

140

Judge Hammond and Judge Horney have authorized me to say that they concur in the views expressed in this opinion.