## CORNIAS *v.* BRADLEY ET AL.

[No. 226, September Term, 1968.]

*Decided July 2, 1969.*

*Motion for rehearing filed July 24, 1969; denied September 8, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, McWILLIAMS, FINAN and SINGLEY, JJ.

*James B. Carson,* with whom was *Peter G. Angelos* on the brief, for appellant.

*William M. Nickerson,* with whom were *Due, Whiteford, Taylor & Preston* and *Sigmund R. Kallins* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

This appeal involves the correctness of the charge to the jury by the Superior Court of Baltimore City (Harris, J.) in a personal injury case arising out of an automobile collision at the intersection of Gay and Pratt Streets in Baltimore City. The trial court instructed the jury that the boulevard law was not applicable and this is the principal error alleged by the appellant, Michael Cornias, who was the plaintiff in the lower court.

Pratt Street is approximately 95 feet wide at its intersection with Gay Street. It is a multi-laned thoroughfare for traffic proceeding generally in an east-west direction. Gay Street, which begins at the northern side of Pratt Street and at this point runs in a northerly direction, is 36 feet wide.

The records of the Department of Transit and Traffic of Baltimore City indicate that on the date of the collision, July 28, 1961, Pratt Street traffic was controlled by a series of traffic signal lights, consisting of two lights for leaving Gay Street, two lights for eastbound traffic and two lights for westbound traffic on Pratt Street; and two lights for traffic leaving Pier 3, which begins on the south side of Pratt Street and extends into the waters of the Patapsco River. The general sequence of these automatic signal lights is (1) green for eastbound and westbound traffic on Pratt Street, all others red; change to yellow for westbound traffic on Pratt Street, the lights remaining green for eastbound traffic on Pratt Street; (2) change to red for westbound traffic on Pratt Street, green for eastbound traffic on Pratt Street, with a left turn arrow for northbound traffic into Gay Street, and, at the

same time, red for southbound traffic on Gay Street, but with a green arrow for southbound traffic on Gay Street turning to the west on Pratt Street; change to yellow for eastbound traffic on Pratt Street with the extinguishment of the left turn arrow for eastbound traffic on Pratt Street, all other lights remaining the same; (3) change to green for southbound traffic on Gay Street and a flashing red light for traffic leaving Pier 3; change to yellow for southbound Gay Street traffic and solid red for Pier 3; change to begin cycle again. The traffic signals for Gay Street and for Pier 3 are activated by an overhead radar on Gay Street, 66 feet from the intersection of Gay and Pratt Streets, and by pedestrian pushbuttons at the corner and at the head of Pier 3. If there is no traffic on Gay Street to activate the radar, the signal for Pier 3 remains red until someone pushes the pedestrian button. Thus, traffic on Pratt Street has a continuous green light unless the radar is activated on Gay Street or the pushbuttons are operated. The time that the traffic light flashes red for traffic leaving Pier 3 varies, with a minimum time of 10 seconds.

The records of the Department of Transit and Traffic also indicated that there was nothing to change the traffic signal for Pier 3 from red to flashing red at the exit from Pier 3 except the pedestrian pushbutton. As we have seen there has never been a treadle or other device which would otherwise control this traffic light. The traffic light controlling the traffic at Pier 3 *never* changes to green and there is a sign facing the pier which bears the legend: "Move on flashing red after stop."

We now turn to what occurred at this rather complicated intersection on July 28, 1961. On that date, at approximately 1:00 p.m., the plaintiff and appellant, Michael Cornias, was operating an automobile in a westerly direction on the north side of Pratt Street. He had turned into Pratt Street at its intersection with Frederick Street, located one block east from Gay Street. As he approached the intersection of Pratt and Gay Streets, intending to turn right in order to go north on Gay Street, he stopped

in the extreme right-hand lane in obedience to the red light which was then facing him. When the light changed to green, Mr. Cornias testified that he looked to his left and noticed traffic moving westward, or what looked to be westward, on Pratt Street. He then drove forward to make his right turn into Gay Street. He did not specifically remember seeing the truck which shortly thereafter struck his automobile but stated that it could have been there as the traffic he saw.

Sam Bradley, Jr., one of the defendants below and one of the appellees here, was employed by Baltimore Transfer Company, the other defendant and appellee, to operate a "straight job truck" or "van," a two and one-half ton 1955 "International", which Mr. Bradley described as being 16 to 18 feet long at one point and 50 feet long at another point. He had gone to Pier 3, Old Bay Line, on the day of the collision to make a delivery. After leaving his freight, he drove the truck back to the head of Pier 3, "near 1:00 o'clock or after 12:00 o'clock," when he was confronted with a solid red light. In a split second or so after his arrival at the head of Pier 3, he "could see" that "traffic had stopped" or "was coming to a stop." After traffic had come to a complete stop, he looked again at the red light, saw that it was flashing and then proceeded into the intersection. He stated that it was in his mind that he had run over a treadle on Pier 3 to change the red light to flashing red, but on cross-examination when asked "that is really not the case, is it?" replied "I don't know. I am still thinking that is what made the light change."

The point of impact between the Cornias' automobile and the truck was in or near the east-west crosswalk of Gay Street. Mr. Cornias testified that he had completed "about maybe two-thirds or three-fourths" of his turn, and was facing north by northwest at the moment of impact. Mr. Bradley testified that he had "got all the way across" Pratt Street before he "felt this impact," and that the front of the truck was "all the way into the sidewalk" on the north side of Pratt Street. The sidewalk on

the north side of Pratt Street is 19 feet, 6 inches wide at Gay Street.

Mr. Cornias testified that it was his recollection that the front bumper of the truck hit him first on the left front fender of his automobile and then the rear wheels of the truck hit his vehicle as the truck went past. The major damage was done by the rear wheels.

Mr. Bradley marked a photograph, introduced into evidence, to show that the impact occurred at the top of the center of the rear wheels of the truck, the photograph showing dark marks along the body of the truck which he did not recall being there when he began his trip. He testified on direct examination:

> "When I got out of my truck and walked around to the back, at this point, this car that this gentleman [Cornias] was driving was over right up against the front of my truck, where you can see he must have tried to make this right turn and after he discovered I am here, he must have pulled to his right. But it actually hit on the right rear wheel of my truck that I was driving.
>
> * * *
>
> "Q. Did you ever see that automobile that struck you before the impact happened? A. Never seen it. Everything I seen was stopped and the only thing that—the way I felt the impact, it seemed as though one of the wheels had fell off or something, and in a second I looked and I saw this car and this man was leaning over into the left post of his car. So I merely got out and walked around."

On cross-examination Mr. Bradley testified:

> "Q. When you got out, you looked at the vehicles, was your truck up against his car? A. I don't recall, but I think it was. I couldn't swear to it.

"Q. What part of your truck was up against his car? A. At that particular time?

"Q. Yes sir. A. I don't know, but I think it would be more or less parallel, but at the time —it seemed as though he was a little beyond me at that time, had made his complete—by that time he had made a complete turn, headed the same way I was, just a little beyond me.

"Q. His car in front of your truck; is that your testimony? A. On the right side of it, just the front of it. As I looked out the window, this man was laying over the left, on the steering wheel."

As we have noted, Mr. Bradley testified that he never saw the Cornias' automobile before the impact. On cross-examination he testified that he was looking to the front but did not know why he did not see the Cornias vehicle. All he knows was that traffic had stopped. He had attained the speed of 6 or 7 miles per hour prior to the collision from the time he had left his stopped position at Pier 3.

Harry Wright, a stevedore employed on July 28th by the Old Bay Line, was called as a witness for the defendants. He was seated near the head of Pier 3 on the left-hand side, on a crate during the lunch hour. He testified:

"Q. What did you see? A. See, they have a blinker started, he throwed up his hand. So he say 'I'll see you.' Well, I still sitting there. After he got all the way across the street, he had a collusion [sic] in the last lane on the—

"(The Court) Collision is a better word.

"A. He had a collusion [sic] over there, after he had done got on the last lane. He was all the way across.

"Q. All right. Now, was his truck stopped at the end of the pier at anytime before he started off? A. Yes, sir. He stopped after the blinker started. Then he come out.

"(The Court) Did you notice the color of the light when he first came up to the entrance of the pier?

"(The Witness) The blinker?

"(The Court) Yes.

"(The Witness) Yes. When it started blinking it was red.

"(The Court) Was it red at first and then started to blink?

"(The Witness) No, sir. When it started to blinking, then the trucks coming out from out of the piers supposed to come out."

Mr. Wright further stated that when the light started blinking, Mr. Bradley pulled off, said "I'll see you" and threw up his hand. Mr. Bradley had to curve around (from a northerly direction to a northwesterly direction) to get from Pier 3 to Gay Street. He traced a wide arc to show how the truck proceeded across Pratt Street. He stated that there was "right smart" of traffic on Pratt Street and that the Cornias vehicle was in the north curb lane. He saw the Cornias automobile moving a little before the impact after it had passed in front of the other automobiles waiting for the light on Pratt Street. He stated that the "blinker was still on" at the time of the collision, that all of traffic on Pratt Street was stopped, and that it was not until something like a second or two after the collision that the other cars on Pratt Street started moving.

There is no evidence in the record that Mr. Cornias offered any evidence to show specifically that Pratt Street was designated as a boulevard.

After instructions by the trial court, which we will consider later in the opinion, the jury considered the case and found a verdict for the defendant. From a judgment for costs entered upon this verdict, the plaintiff Cornias filed a timely appeal.

The appellant Cornias briefed and argued four questions before us, as follows:

1. The trial court erred in refusing to instruct the jury in regard to the application of the "boulevard law" to the facts of the case.

2. The trial court erred in instructing the jury that, as a matter of law, the sign "Move on flashing red after stop" under the circumstances of the case removed Pratt Street as a favored highway or boulevard and that Code (1957), Article 66½, §§ 196(1), 233(a) and (b) and 242(a) and (c) did not apply on the facts in the case.

3. The trial court erred in instructing the jury that Bradley was "lawfully in the intersection and that Cornias had an absolute duty not to enter the intersection on his green light until the truck had cleared the intersection.

4. The trial court erred in refusing to direct the verdict for the plaintiff Cornias on the question of liability.

We now consider the relevant portions of the instructions of the trial court.

After general and correct instructions to the jury in regard to the binding effect of the court's instructions on the law, but not on the facts, of which the jury is the sole judge, burden of proof, negligence and contributory negligence, and the general obligations of operators of motor vehicles to follow the Maryland law in regard to traffic signals, the trial court instructed the jury:

"Under the facts of this case, I instruct you that the boulevard law is not applicable. This is due to the fact that there is no evidence that Pratt Street is a boulevard, at least at this intersection. The evidence shows that traffic on Pratt Street was controlled by the usual green and red traffic signals; that southbound traffic on Gay Street was controlled by lights on the south side of Pratt Street, which would show solid red or flashing red—I'm not certain what the evidence shows as to southbound Gay Street traffic; however, this traffic can make a turn either right or left into Pratt Street. The im-

portant signals, of course, are the traffic signals on the north side of Pratt Street to regulate traffic egressing from Pier 3 on the south side of Pratt Street. The evidence shows that these lights were either red, or that they would flash red to allow traffic to egress from Pier 3. The exhibits filed in the case show that there are two such lights parallel with each other and hanging above the north side of Pratt Street. In the middle of the two lights is a sign reading 'Move on flashing red after stop.'

"I instruct you as a matter of law that this sign 'Move on flashing red after stop', when considered with the traffic signals on Pratt Street, remove Pratt Street as a favored highway or as a boulevard, and that both of these operators were under the obligation to obey the traffic signals which were facing them.

"I instruct you that each party had the following right and following obligation:

"The plaintiff, facing the red light for westbound traffic on Pratt Street, was under a legal obligation to wait until his traffic signal changed to green; and when it did change to green, he had a right to move forward, subject to the further obligation that he must yield the right of way to all traffic legally within the intersection at that time. In other words, when you face a red light and it changes to green, you do not have an absolute right of way to go forward immediately. If traffic is lawfully within the intersection coming from a different direction, the operator who gets the green light must still wait and yield the right of way to let such traffic lawfully within the intersection completely clear the the intersection. Mr. Bradley was under the obligation to stop his truck before entering Pratt Street from Pier 3 if you find that the traffic

signals showed solid red for traffic leaving Pier 3 at that time. He was under an obligation not to move forward to cross Pratt Street into Gay Street until those lights changed to flashing red.

"Those lights are somewhat unusual. Quite often lights flash green or flash amber, but in this case they flash red. Red usually means stop, but when the red signals flashed in this case they meant go. Therefore, Mr. Bradley had a legal right at that time to proceed across Pratt Street, if you find that the traffic lights facing him changed from solid red to flashing red. He was under the same obligation, when he got the flashing red signals, to yield the right of way to all traffic then legally in the intersection. Other than that obligation, he did have the right to cross Pratt Street and enter, or attempt to enter, Gay Street on a diagonal line, being sure that he did not collide with traffic already lawfully within the intersection.

"Thus, the rights of both of the operators in this case were equal and each, subject to the rules that I have outlined to you, had the same obligation to exercise ordinary and reasonable care to avoid striking the other. It is your function to find which driver was negligent, or if both drivers were negligent, in the operation of their motor vehicles."

Counsel for the plaintiff Cornias duly excepted to the charge for refusal to grant the plaintiff's motion for a directed verdict on the grounds that the case was a boulevard case and there should have been an instruction that Bradley was negligent as a matter of law; and further that:

"* * * the Court erred regarding the instructions of the sign because under the Court of Appeals case, Belle Isle Cab Company versus Pruitt, 187 Maryland 174, at page 179 to 181, I

believe, 49 Atlantic Second, 537, page 539, and also the case of Sonnenburg versus Monumental Motor Tours, Incorporated, 81 Atlantic Second, 617, 198 Maryland 227, the Court of Appeals has held that a municipality does not or any other authority does not have the power to change the meaning of traffic signals as established by the annotated code of Public General Laws of Maryland. The meaning of those traffic laws is clearly established by the Annotated Laws of Maryland. Regardless of what signs were posted there, that the words 'Go on flashing red' do not change the law of Maryland, which the plaintiff contends is that on a flashing red light, Article 66½, Section 196, makes the boulevard law applicable."

### (1) and (2)

In our opinion, the trial court erred in refusing to instruct the jury that Pratt Street was a boulevard at the intersection of Pratt and Gay Street and of Pratt Street and Pier 3. There was error in the instruction that the rights of both operators in the case were equal under the circumstances of this case. The trial court also erred in ruling that Article 66½, §§ 196(1), 233(a) and (b) and 242(a) and (c) did not apply on the facts in this case.

The basic question is whether or not under the applicable statutory and case law, Pratt Street at the intersections mentioned is a "boulevard" so that Mr. Bradley's movement of the truck would be governed by the Maryland law relating to boulevards. The trial court was of the opinion that it was not, and that Mr. Bardley was entitled to move into Pratt Street on the flashing red light as if, in effect, it was the equivalent of a green traffic light. We do not agree with the trial court's opinion in this regard. It is established by the testimony that traffic emerging from Pier 3 into Pratt Street never had a green light, but only a flashing red light when the overhead radar on Gay Street was activated or the buttons pressed by pedestrians at the entrance to Pier 3. The sign

itself, erected by the Baltimore City Department of Traffic and Transit directed traffic emerging from Pier 3 "to move on flashing red *after stop*" (emphasis supplied) so that the implication is that the operator of the vehicle should proceed as if the flashing light were a conventional stop sign and subject to the rule applicable in that situation. Indeed the applicable statutory law so provides. Art. 66½, § 196 (1) provides:

> "*Flashing red (stop signal)*—When a red lens is illuminated by rapid intermittent flashes, drivers of vehicles shall stop before entering the nearest crosswalk at an intersection or at a limit line when marked and the right to proceed shall be subject to the rules applicable after making a stop at a stop sign."

Although we do not believe that there is any inconsistency created by the use of the flashing red light with the sign, it is clear from the decisions of our predecessors, that the sign could not legally alter the meaning of the flashing red light as prescribed by the applicable Maryland statutory law.

As Judge (later Chief Judge) Henderson stated, for the Court, in *Belle Isle Cab Co. v. Pruitt*, 187 Md. 174, 180-81, 49 A. 2d 537, 539-40 (1946) :

> "It is earnestly contended, however, that the relative rights and duties of the two drivers were modified by the fact that the Police Department had erected a sign upon the favored highway reading 'Slow, Dangerous Corner'. It is argued that this sign imposed a special or extraordinary duty of care upon the driver using the favored highway. We do not agree with this contention.
>
> "In the first place, we find nothing in Article 66½ of the Code to indicate that state or local agencies have the power to modify the statutory effect of a stop intersection sign. Section

135 of Article 66½; [now Section 185], dealing with the powers of local authorities, carefully limits their authority to the following matters: (1) parking, (2) 'regulating traffic by means of peace officers or traffic control devices', (3) processions, (4) one-way highways, (5) speed and weight in parks, and (6) 'designating any intersection as a stop intersection requiring all vehicles to stop at one or more entrances to such intersections'. The traffic control devices referred to in (2) are required by Section 139 to conform to the State Manual and Specifications. Detailed specifications are set out in Sections 141 and 142. Section 1 or Art. 66½ provides that the provisions of the Article are intended to be state-wide in their effect 'and except to the extent that they may be specifically authorized by other provisions of this Article, no City, County, or other Municipal subdivision of the State shall have the right to make or enforce any local law, ordinance or regulation upon any subject for which provision is made in this Article'. We do not mean to imply any lack of authority to erect warning or cautionary signs in the interest of safety, nor do we suggest that the slow sign did not conform to standards of uniformity, but we think such signs cannot have the effect of limiting the privilege of uninterrupted travel on a favored highway which the statute confers."

*Belle Isle Cab Co. v. Pruitt, supra,* was cited with approval and followed in *Sonnenburg v. Monumental Motor Tours, Inc.,* 198 Md. 227, 236, 81 A. 2d 617, 621 (1951). See also *State use of Hopkins v. Marvil Package Co.,* 202 Md. 592, 98 A. 2d 94 (1953).

Traffic egressing from Pier 3 was then required to obey the flashing red light in accordance with Art. 66½, § 196(1), regardless of what meaning might possibly be ascribed to the sign, and Mr. Bradley was required to

proceed into Pratt Street as if a conventional stop sign were erected at the entrance of Pier 3. The Maryland law clearly establishes his obligations in this situation. Article 66½, § 233 (a) and (b) provide:

> " (a) *In general.*—The driver of a vehicle shall come to a full stop as required by this article at the entrance to a through highway and shall yield the right-of-way to other vehicles approaching on said through highway.
>
> "(b) *Stopping in obedience to stop sign.*— The driver of a vehicle shall likewise come to a full stop in obedience to a stop sign and yield the right-of-way to a vehicle approaching on the intersecting highway as required herein at an intersection where a stop sign is erected at one or more entrances thereto although not a part of a through highway."

Article 66½, §242 (a) and (c) provides:

> " (a) *Designation of through highways and erection of signs.*—The State Roads Commission with reference to State and county highways, and local authorities with reference to other highways under their jurisdiction may designate through highways and erect stop signs at specified entrances thereto or may designate any intersection as a stop intersection and erect like signs at one or more entrances to such intersection.
> * * *
> "(c) *Duty of driver.*—Every driver of a vehicle shall come to a full stop at such sign or at a clearly marked stop line before entering an intersection and yield the right-of-way to vehicles approaching on the intersecting highway except when directed to proceed by a peace officer or traffic-control signal."

In *Brown v. Ellis,* 236 Md. 487, 493-95, 204 A. 2d 526.

528-29 (1964), Judge (later Chief Judge) Prescott, for the Court, in discussing the application of the boulevard law, stated:

"The question of whether the truck operator was guilty of primary negligence as a matter of law gives us little difficulty. Appellees' main thrust here is that the applicable statute, the so called Boulevard Law, Code (1957), Article 66½, Section 233, requires the operator of an unfavored motor vehicle to come to a full stop, and yield the right of way to vehicles 'approaching' on the favored highway. They argue that the evidence favorable to them showed that he stopped at the stop-sign, and at that time no vehicles were 'approaching' on the favored thoroughfare. This fact, they say, is supported by appellant's statement that he entered Washington Street only 300 to 400 feet south of Biddle Street. And, if appellant were not 'approaching' when the truck operator entered Washington Street, the operator had complied with both provisions of the above Act—he had stopped and he had yielded the right of way to 'approaching' vehicles — consequently, the question of whether he was guilty of primary negligence was properly submitted to the jury.

"With this conclusion, we are unable to agree. The question was answered at least as early as the case of *Shedlock v. Marshall,* 186 Md. 218 (1946), which has frequently been cited, with approval by this Court. There, Chief Judge Marbury, for the Court, reviewed and analysed the previous Maryland decisions and said:

" 'What the statutes, as interpreted by these decisions [all previous Maryland decisions on the subject], mean is that a driver who enters, from an unfavored highway, an intersection with a favored boulevard or arterial

highway where there are no traffic controls must yield the right of way to all the traffic he finds there during the entire time he is there. If he does not, and a collision results, he is at fault and cannot recover against the other driver unless the doctrine of last clear chance enters the case. So far as his rights as a plaintiff are concerned, it makes no difference what the other party does in the first instance. He is negligent because he has not yielded the road. Being negligent himself, his action is barred. But when he is made a defendant in an action for damages resulting from the collision, he can always show that the other party was also guilty of negligence contributing to the accident, and if he succeeds in this, no verdict can be obtained against him. Then both parties are negligent.'

"It is the duty of the driver of a large, ponderous rig to proceed onto a boulevard (not controlled by signals or officers) from a stop-sign only with great caution; he should do so at a reasonable speed under the circumstances (compare Article 66½, Section 211 [e]) — such a speed as to be able to reduce, or to stop if necessary, the forward movement of his vehicle in order to yield the right of way—; he should look observantly and with effect for traffic upon the favored highway, and a 'glance' will not suffice. We do not deem it desirable to labor the question further. By a simple application of the law as enunciated in the above quotation to the facts of this case, it is clear, we think, that the truck driver was guilty of negligence as a matter of law, and the jury should have been so instructed.

"We realize that the Legislature has placed a heavy responsibility upon the operator of a large, cumbersome vehicle (as well as the opera-

tors of other vehicles) when entering upon a through street, but this Court has stated that the salutory purpose of the Boulevard Law is to facilitate the flow of traffic on the favored street; and, under proper circumstances, the rights of the owners and operators of such vehicles are protected by the law relative to contributory negligence and the doctrine of last clear chance."

See *"Bothersome Boulevards"* by John W. T. Webb, Esquire, in 26 Md. L. Rev. 111, 113 (1966), in which the following is stated:

"The same duty to stop and yield the right of way is imposed by statute on the driver entering a paved highway from an unpaved road, or from a private road or driveway. Regardless of the nature of the favored highway under such circumstances, it is considered a 'boulevard' under the Boulevard Rule. *Over the vigorous protest of Chief Judge Brune, the court has also found a red traffic light to create a 'boulevard' for the driver with the green light. The same result will also apply at the intersection where there is a flashing yellow light for traffic on the favored highway and a flashing red light for traffic on the unfavored highway, although both decisions involving this section have also involved a 'stop' sign on the unfavored highway, which the court considered insignificant."* (Emphasis supplied.)

We and our predecessors have vigorously applied the boulevard law and have held that the unfavored driver entering a boulevard must yield the right-of-way to all traffic he finds in the intersection during the entire time he is there. Judge Finan, for the Court, in *Trionfo v. R. J. Hellman, Inc.,* 250 Md. 12, 17-18, 241 A. 2d 554, 558 (1968), aptly summarized the Maryland law as follows:

"In *Shedlock v. Marshall,* 186 Md. 218, 235,

46 A. 2d 349, 357 (1946), Chief Judge Marbury, speaking for the Court, reviewed the prior decisions and then current statutes pertaining to the Boulevard Rule and its development, stating:

'What the statutes, as interpreted by these decisions, mean is that a driver who enters, from an unfavored highway, an intersection with a favored boulevard or arterial highway where there are no traffic controls *must yield the right of way to all the traffic he finds there during the entire time he is there.* If he does not, and a collision results, he is at fault and cannot recover against the other driver unless the doctrine of last clear chance enters the case.' (Emphasis supplied.)

"*Shedlock,* has been relied upon by this Court in *Cooper v. Allen,* 243 Md. 9, 219 A. 2d 920 (1966) ; *Brown v. Ellis,* 236 Md. 487, 204 A. 2d 526 (1964) ; *Harper v. Higgs,* 225 Md. 24, 169 A. 2d 661 (1961) ; and *Green v. Zile,* 225 Md. 339, 170 A. 2d 753 (1961)."

We applied this rule most vigorously in *Cooper v. Allen,* 243 Md. 9, 219 A. 2d 920 (1966), when the majority of the Court, after reargument, held that it was contributory negligence as a matter of law for the unfavored driver having entered a boulevard controlled by a stop sign to have failed to yield the right-of-way to a vehicle stopped at a stop light some 150 feet distant, which was operated by a driver, alcoholically stimulated, who speeded forward, paid no attention to the entering driver and crashed into him. Although three of the judges of this Court who sat in the present appeal, dissented in *Cooper* (Judge—now Chief Judge—Hammond, Marbury and Barnes, JJ.), the Court is unanimously of the opinion that the facts in the present case easily bring it within the ambit of *Cooper* and we are constrained by the proper application of the doctrine of *stare decisis,* to follow and apply the decision of *Cooper* in the present case.

The trial court should have instructed the jury that Pratt Street was a boulevard at the intersections in question and that the obligations of Mr. Bradley were those set out in the applicable statutory and case law mentioned above. These errors in the charge, were, in our opinion, prejudicial.

(3)

As we have indicated the trial court instructed the jury that Mr. Bradley "had a legal right at that time to proceed across Pratt Street" if the jury found "that the traffic lights facing him changed from solid red to flashing red." This improperly denied the plaintiff the instruction that the boulevard law applied, that Mr. Bradley was the unfavored driver and obligations attendant upon the boulevard law applied. The trial court, in effect, charged the jury that the "green light—red light—rule was applicable so that if Mr. Bradley had a favorable traffic signal, he would be entitled to complete his trip even if the light changed in the course of passage." See *Valench v. Belle Isle Cab Co.*, 196 Md. 118, 75 A. 2d 97 (1950); *Baltimore Transit Co. v. Presberry*, 233 Md. 303, 196 A. 2d 717 (1964). See also *Eastern Contractors, Inc. v. State use of Seifert*, 225 Md. 112, 169 A. 2d 430 (1961).

As we have indicated this rule was not applicable under the facts of this case; the boulevard law was applicable and the jury should have been so instructed. Here again, the error in the charge in this regard was prejudicial.

(4)

In our opinion, it would not have been proper for the trial court to have directed the verdict for the plaintiff Cornias on the question of liability as the appellant contends. There was sufficient evidence from the witness Wright, with reasonable inferences, from which the jury might have found that the plaintiff was guilty of contributory negligence. Mr. Wright testified that Mr. Bradley came to a stop and then started from Pier 3 across

Pratt Street when the flashing red light began. By the sequence of the lights, the traffic light on Gay Street was green for southbound traffic on Gay Street and red for eastbound traffic on Pratt Street. The time for the flashing light varies but has a minimum of 10 seconds. Mr. Bradley testified that he was going seven miles per hour and it cannot be said as a matter of law that he could not have successfully crossed Pratt Street during the time of the flashing light and entered Gay Street prior to the change of the traffic light on Pratt Street from red to green for eastbound traffic. Mr. Wright clearly testified that the red light at Pier 3 was still blinking when the collision occurred, although his testimony that "It blinked around seven or eight seconds, something like that" meant that this occurred after the collision or after he observed the blinking of the light for the first time. It could well be argued that he meant that the blinking continued for seven or eight seconds *after the collision,* in view of the testimony that the blinking light varied in time but has a *minimum* of *ten* seconds. He further testified that the truck had arrived at Gay Street when the Cornias car, in the sixth lane hit the truck, after which the driver, Cornias, got out of his car and went to the rear of the truck. At that time, traffic was still stopped on Pratt Street and "hadn't started up until he got out. It started up about a couple of seconds after he got out." We believe that the inference could have been drawn from Wright's testimony, together with the other evidence of the point of impact, location of the damage to the truck, and the sequence of the lights, that the plaintiff Cornias started forward when the light before him was still red, and when the truck was or should have been in full view. In the alternative, if the jury found that the light had changed to green for Mr. Cornias, it is clear that even then he could not proceed to enter the intersection with utter disregard of the traffic that might still be in the intersection. Under either circumstance, the jury might have found that, but for the unlawful and negligent act of Cornias, the accident would not have occurred, so as

500

to bar any recovery on his part. The case of *Cooper v. Allen, supra,* in no way alters this result. In that case, the Court held only that the *plaintiff*, entering a boulevard from an unfavored highway, was contributorily negligent as a matter of law, and because of the posture of the case, found it unnecessary to consider any question of the defendant's actions. It is clear from the Court's opinion that the *Cooper* case did not affect the doctrines of contributory negligence and last clear chance, as they would otherwise apply. See *Brown v. Ellis, supra.* In the present case it is our opinion that the question of liability was for the jury.

> *Judgment reversed and case remanded for a new trial, the costs to be paid by the appellees.*